2016 IL App (2d) 150492
No. 2-15-0492
Opinion filed June 30, 2016

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| ALSJ, INC., | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiff and Counterdefendant- | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | No. 11-CH-2344 |
| | ) | |
| LAURA J. KURTZ, | ) | |
| | ) | Honorable |
| Defendant and Counterplaintiff- | ) | Robert G. Gibson, |
| Appellee. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1 Plaintiff, ALSJ, Inc., filed a complaint to foreclose a mortgage against defendant, Laura J. Kurtz. Kurtz filed, *inter alia*, an affirmative defense and a counterclaim, each of which alleged that ALSJ violated the Mortgage Rescue Fraud Act (Act or Mortgage Fraud Act) (765 ILCS 940/1 *et seq.* (West 2014)). The trial court found that Kurtz defaulted on the loan. However, it also found that ALSJ violated the Mortgage Fraud Act. The court characterized ALSJ's actions as part of an "equity-stripping scheme" against Kurtz, whereby Kurtz, a legally unsophisticated homeowner, would lose her home for failing to satisfy a "facially outrageous" one-year balloon mortgage. The court rescinded the mortgage documents and awarded attorney

fees to Kurtz. ALSJ appeals, arguing that: (1) the Mortgage Fraud Act does not apply, because ALSJ is not a "distressed property consultant";[1] (2) even if the Mortgage Fraud Act applies and ALSJ violated it, Kurtz is not entitled to relief, because she is not a "consumer"; (3) even if Kurtz is entitled to relief, the court abused its discretion by rescinding the mortgage documents, because the rescission resulted in a windfall to Kurtz; and (4) even if Kurtz is entitled to relief, the court abused its discretion in awarding attorney fees. ALSJ also argues that the court erred in denying its motion to reconsider. Kurtz did not file an appellate brief. We reject each of ALSJ's arguments, and we affirm the court's judgment.

¶ 2                                    I. BACKGROUND

¶ 3      The mortgage documents between Kurtz and ALSJ include: (1) an installment note in the amount of $66,000; (2) a trust deed in favor of ALSJ; (3) an escrow agreement; (4) a warranty deed; and (5) a business-purpose affidavit (wherein Kurtz averred that the loan was for commercial purposes). The mortgage documents pertained to a single-family residence in Lombard (the subject property). The closing on the loan took place in March 2010. Kurtz made less than six months of payments on the loan. In May 2011, ALSJ filed its complaint for foreclosure.

¶ 4      Kurtz filed an affirmative defense and a counterclaim, alleging that ALSJ violated the Mortgage Fraud Act. ALSJ does not seem to dispute that the terms of the mortgage documents violate the Mortgage Fraud Act as applied to distressed-property consultants, distressed properties, and distressed-property owners. The documents set forth a one-year balloon

---

[1] ALSJ appears to concede that, if it is a "distressed property consultant," the Mortgage Fraud Act applies and it violated the Mortgage Fraud Act.

mortgage that would ultimately bear a 36% interest rate with a late fee of $693. However, again, ALSJ contends that it is not a distressed-property consultant.

¶ 5                             A. First Day of Trial

¶ 6     The trial court held a two-day trial on the parties' filings. Kurtz's attorney did not appear the first day, but he appeared the second day. On the first day, the parties primarily addressed the issue of whether Kurtz defaulted on the loan. The court found that she did. ALSJ's witnesses began testimony regarding Kurtz's affirmative defense and counterclaim, as follows.

¶ 7                             1. Andrew Lee

¶ 8     Andrew Lee testified that he is the president and founder of ALSJ. ALSJ lends money to real-estate developers. ALSJ lends money only for commercial purposes, not for individual homeowners. Lee believed that Kurtz wanted the loan for commercial purposes, because Kurtz provided him with an affidavit that stated:

> "To induce ALSJ Incorporated to loan me the aforementioned sum, I hereby represent that said sum is being used solely for business purposes and not for personal, family, or household purposes."

Lee requires a similar statement from each entity or person to whom he issues a loan. Kurtz never told Lee that she was residing in the subject property or that she might lose the property if she did not obtain a loan to pay the taxes. A broker, Zoran Bozovic, referred Kurtz to Lee. Lee talked to Kurtz by phone; he never met her.

¶ 9                             2. Robert Hall

¶ 10    Robert Hall testified that he is an attorney and that he represented Kurtz in her transactions with ALSJ. Hall informed Kurtz that the loan was to be used for commercial purposes. Hall believed that the loan would be used for commercial purposes, because Kurtz

signed an affidavit that so stated. Hall believed that Kurtz lived in an apartment in Lisle, because Kurtz showed him documentation with that address. During Hall's testimony, the court interjected to ask how Kurtz came to be Hall's client. (Again, Kurtz's attorney was not present.) Hall could not recall whether Kurtz was referred to him. He believed that Kurtz called him to initiate the relationship.

¶ 11                                    3. Jeffery Asner

¶ 12    Jeffery Asner testified that he works for ALSJ. ALSJ seeks real estate to buy, repair, and then sell for profit. Sometimes ALSJ issues loans to businesses that do the same. Bozovic informed ALSJ that Kurtz was looking to rehab a property and then sell or rent it. Bozovic further told ALSJ that, if Kurtz rented the property, she would seek to refinance with a conventional mortgage. Kurtz provided ALSJ with a pay stub that listed a Lisle apartment as her address. To decide whether to issue the loan, Asner walked through the subject property. In his view, although the necessary repairs were mostly cosmetic, he did not think that the house was livable. He did not think that it looked as though anyone was living there, because there was no furniture.

¶ 13                                 B. Second Day of Trial

¶ 14                                        1. Lee

¶ 15    Lee testified again. He stated that he would voluntarily seek a lower amount than the amount due, effectively reducing the interest rate from 36% to 9%. He would also cancel the late fees. Lee reiterated that, when he issued the loan, he thought that it was for commercial purposes. Lee testified that he had served in the military, was 78 years old, and had suffered from a heart attack and cancer.

¶ 16    On cross-examination, Lee testified that Bozovic approached ALSJ.  ALSJ did not have an agency relationship with Bozovic.  Bozovic told ALSJ that Kurtz was his cousin.[2]  When asked whether he had ever worked with Bozovic or Hall in the past, Lee answered: "We get many leads from people," and "No.  Unless he was the attorney from yesterday."

¶ 17                                    2. Kurtz

¶ 18    Kurtz testified that, in 2008, her mother passed away and bequeathed the subject property to her and her sister.  For the first few months, Kurtz, who had never owned a home before, lived in her Lisle apartment.  Her sister and her sister's husband lived in the subject property.  They began basic renovations, like paint and kitchen tile backsplash.  Then, the family decided that Kurtz would be the sole owner of the home.  In May 2009, her sister transferred title in the home to her.  Kurtz and her son (age not specified) moved into the home.  Kurtz then learned that the home carried approximately $8,000 in delinquent taxes.  Kurtz, who worked in a jewelry store, did not have good credit to obtain a loan to pay the delinquent taxes and finish the renovations.

¶ 19    A customer at the jewelry store, Corey Hughes, told Kurtz that his company, New Frontier Financial, could help her.  Hughes referred her within the company to Bozovic and Bozovic's partner, Greg Davis.  Bozovic told Kurtz that he could help her obtain a loan, even though she had bad credit.  Kurtz paid Bozovic a $5,700 consulting fee to help her secure a loan.  The transaction took place at a local restaurant.  Bozovic told Kurtz that his "friend," Lee, might be able to provide her with a loan.  Bozovic also referred Kurtz to Hall.  Bozovic told Kurtz that Hall often represented Bozovic's clients and that Hall would not charge a high fee.  Kurtz met Hall at his office.  Hall provided her with a "copious amount of papers."  Hall tabbed the papers

---

[2] This allegation was never explored.  However, it is not supported by Kurtz's testimony.  See *infra* ¶ 19.

for Kurtz's signature, but he did "not really" explain them to her. He did not explain the separate meaning of each document. Rather, he told her generally that her signatures were necessary to procure the loan.

¶ 20 Further, Hall told her that she would no longer need to pay the taxes on the subject property. ALSJ would pay the taxes. Kurtz believed Hall, because she never got a "bill" in the mail to tell her that the taxes were not being paid. (Later, in 2013, ALSJ paid $28,000 to Du Page County for the delinquent taxes in order to meet the redemption period for the tax sale of the property.)

¶ 21 When the loan was issued, Kurtz did not understand that the loan was to be used for commercial purposes. She thought she had obtained an ordinary "mortgage-type" loan against a house that she owned "free and clear." Hall never corrected her impression. When Bozovic stopped returning her calls, Kurtz began to think she had been deceived. Kurtz tried to contact Bozovic, rather than ALSJ, because she thought Bozovic was her "go-to guy." Less than six months after the loan had been issued, Kurtz became convinced that the loan was improper and she stopped making payments. As to her state of mind, Kurtz submitted an e-mail that she wrote to her accountant shortly after she realized the nature of the documents she had signed. The e-mail stated in part:

> "In an effort to clear up some old debt and do some repairs on my parents' house, I worked with a company to get a small loan to do this thinking it was a mortgage-type loan against the house I fully owned. Long story short, I was scammed into a loan that over the course of six months I paid about $12,000 in interest. In essence, it was a[n] [il]legal loan shark paperwork and all up to and including a $10,000 pay day for the mortgage broker.

It is now in the hands of my attorneys. Is there any tax relief on this?"

¶ 22   ALSJ's attorney asked Kurtz how she possibly could have believed that the loan was an ordinary home mortgage against her property, given the terms of the loan itself. Kurtz answered that she had no experience with home mortgages. She had always lived in an apartment.

¶ 23   Kurtz did not recognize the alleged 2009 pay stub, referenced by Asner, that listed the Lisle apartment as her address. Rather, to substantiate her claim that she resided in the subject property, Kurtz submitted: (1) pay stubs from 2009 forward that listed the subject property as her address; (2) February 2010 homeowner's insurance on the subject property ("[A]s soon as I moved in, I had to change it from no people living in the house to people living in the house because it's way different expense-wise."); (3) copies of loan payments to ALSJ issued on personal checks that listed the subject property as her address; (4) copies of her personal income tax forms from 2009 to 2012 that listed the subject property as her address; (5) utility bills from 2009 forward that listed the subject property address; and (6) an appraisal listing Davis as the lender/client, performed before ALSJ issued the loan, containing pictures of a fully furnished interior. Kurtz testified specifically to pictures of her furnished bedroom, her son's furnished bedroom, and the furnished dining room.

¶ 24                                3. John Michael Kurtz

¶ 25   Kurtz's son, John Michael Kurtz, testified that he has been living in the subject property with his mother since 2009. He was present in 2009 when several men walked through the home to conduct an appraisal. One of the men was Lee's son, Josh Lee. The house was fully furnished at that time.

¶ 26   After John Michael testified, Kurtz sought to admit a number of exhibits. One exhibit was the Davis appraisal. ALSJ objected to its admission. Kurtz stated that, based on the pictures

of furniture in the house, the document was probative of whether Kurtz was living in the subject property during the time in question and the document had impeachment value against ALSJ witnesses who had testified that, at the time of the appraisal, the home had no furniture. The court initially stated that it would reserve judgment on the appraisal's admission. However, apparently the court admitted it, because, after listing the remainder of the exhibits, the court asked Kurtz's attorney if he would like to question Lee about the appraisal. Kurtz's attorney took the opportunity. (We do not see the Davis appraisal in the record.)

¶ 27                                         4. Lee

¶ 28    Lee attempted to distance himself from the Davis appraisal, stating that ALSJ had conducted a *separate* appraisal. Lee stated that ALSJ does its own appraisals. Lee's sons usually perform the appraisals. Lee came along on the ALSJ appraisal; John Michael let the ALSJ group into the home. ALSJ's appraisal was not part of the court record. There was not a copy of it, because ALSJ's appraisals were informal. At the time of ALSJ's appraisal, there was no furniture in the home.

¶ 29    Kurtz never gave Lee a reason to believe that she lived in the subject property. Lee never noticed that Kurtz's personal checks to ALSJ listed the subject property as her address. If he examined each check that carefully, he "would never get through a day."

¶ 30    Finally, as to ALSJ's connection to Davis and Bozovic, Lee acknowledged that he had previously taken referrals from Davis and Bozovic. However, Davis and Bozovic were not employed by ALSJ in any capacity. ALSJ had nothing to do with the consulting fee Kurtz paid to Bozovic.

¶ 31                                     C. Written Order

¶ 32    In its written order, the trial court stated that Kurtz had defaulted on her loan.  However, it also stated that Kurtz proved her affirmative defense and counterclaim pursuant to the Mortgage Fraud Act.

¶ 33    The court determined that the Act applied to the subject property and to the parties.  The evidence at trial "conclusively" demonstrated that the subject property qualified as a "distressed property" under the Act, as it was a "residential real property consisting of one to [six] family dwelling units that is in foreclosure or at risk of loss due to nonpayment of taxes, or whose owner is more than 30 days delinquent on any loan that is secured by the property."  765 ILCS 940/5 (West 2014).  Additionally, ALSJ qualified as a "distressed property consultant" under the Act, as it was "any person who, directly or indirectly, for compensation from the owner, makes any solicitation, representation, or offer to perform or who, for compensation from the owner, performs any service that the person represents will in any manner do any of the following: *** (8) save the owner's residence from foreclosure or save the owner from loss of home due to nonpayment of taxes."  *Id.*  The court rejected ALSJ's argument that Kurtz was ineligible for the protections of the Act because she did not occupy the subject property.  The court stated that the Act did not specify owner occupancy as a requirement.  Further, even if owner occupancy were a requirement, Kurtz established owner occupancy.

¶ 34    Next, the court determined that ALSJ violated the Act; it "utterly failed to comply with the statutory provisions."  ALSJ induced Kurtz to enter into a mortgage for her distressed property in order to secure a one-year note ultimately bearing a 36% interest rate with a late fee of $693.  The loan was "facially outrageous."  In little over four years, Kurtz had accrued approximately $153,000 in interest and fees on the $66,000 loan, increasing the total owed to over $200,000.  The court believed that ALSJ knew that its loan was "outrageous," and, in

"recognition of its patent illegality," it voluntarily lowered the interest rate from 36% to 9% and cancelled the late fees. The court also believed that ALSJ attempted to avoid criminal prosecution by garnering sympathy for Lee's advanced age and declining health.

¶ 35 ALSJ also induced Kurtz to enter into a warranty deed, whereby, in the event of a default, Kurtz would be divested of the subject property. "The violation amounted to an equity stripping scheme, which the Act seeks to combat." Finally, ALSJ referred Kurtz to Hall,[3] who "provided little if any counsel and essentially rubber-stamped the transaction by having Kurtz execute the documents."

¶ 36 In issuing a remedy, the court cited section 55 of the Mortgage Fraud Act (765 ILCS 940/55(a) (West 2014)), which states that any consumer suffering loss under the Mortgage Fraud Act may be granted a remedy under the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 *et seq.* (West 2014)). The court determined that the appropriate remedy would be to rescind the mortgage documents. The court would hear the issue of attorney fees at a later date.

¶ 37                                   D. Motion to Reconsider

¶ 38 ALSJ moved to reconsider. It argued that the Act did not apply, because: (1) the subject property was not a "distressed property"; (2) ALSJ was not a "distressed property consultant," because it did not make any offer to Kurtz with regard to her delinquent taxes; (3) the loan was for commercial purposes; and, relatedly, (4) Kurtz did not reside in the subject property, and her testimony to the contrary was not credible. As to its third and fourth arguments, ALSJ noted that

---

[3] This is a misstatement. Even under Kurtz's theory of the case, Bozovic, not ALSJ, referred Kurtz to Hall. We make the correction for accuracy; it does not affect our overall impression of the trial court's ruling.

the loan would not be considered "facially outrageous" if it had been issued to a business person who intended to sell the property within one year.

¶ 39    The trial court denied the motion to reconsider. It stated that the subject property was a "distressed property," because it was at risk of being lost due to late taxes. It summarily stated that ALSJ was a "distressed property consultant." As to ALSJ's third and fourth arguments, the court explained:

> "Having a homeowner sign a paper saying it's a commercial loan doesn't make it a commercial loan. The testimony of Miss Kurtz and her son were more credible than [ALSJ's] witnesses. The documentary evidence supported [Kurtz's] position that the subject property was her owner-occupied personal residence."

The court concluded that, at trial, it had resolved the commercial-versus-residential issue in favor of Kurtz and that there was no basis for it to reconsider that determination.

¶ 40                            E. Attorney Fees

¶ 41    In considering whether to award attorney fees to Kurtz, the court noted that, even though ALSJ clearly violated the statute, ALSJ did issue a $66,000 loan, approximately $42,000 of which Kurtz was able to retain, even accounting for the portions of the loan that Kurtz repaid and the fees paid to those involved in the loan process. Thus, the court, seemingly *sua sponte*, considered whether awarding attorney fees would result in a windfall to Kurtz.

¶ 42    The trial court asked the parties if they would like to "settle" the matter right then. The court suggested that Kurtz forgo an award of attorney fees in exchange for ALSJ's promise that it would not pursue an unjust-enrichment claim against her. The court weighed aloud the positives and negatives of such an arrangement. It offered that Kurtz's enrichment was not necessarily "unjust," because ALSJ violated the statute. Still, the "settlement" would "at least

bring an end to the situation." The court asked the parties if "any of that" had "crossed [their] minds."

¶ 43    ALSJ refused the court's suggestion, stating that it would not speak to whether it would be pursuing "additional remedies." However, it asked the court to include Rule 304(a) language in its order. The court stated, "Well, if there's an order today granting attorney fees, there's nothing left in the case, is there?" Kurtz responded, "I would think not." ALSJ responded, "But just to make the matter clear, [Y]our Honor." The court again stated that it did not believe that any claims remained pending, but it included the Rule 304(a) language in its order granting Kurtz $9,740 in attorney fees.

¶ 44                                    II. ANALYSIS

¶ 45    On appeal, ALSJ argues that: (1) the Mortgage Fraud Act does not apply, because ALSJ is not a "distressed property consultant;" (2) even if the Mortgage Fraud Act applies and ALSJ violated it, Kurtz is not entitled to relief, because she is not a "consumer"; (3) even if Kurtz is entitled to relief, the court abused its discretion by rescinding the mortgage documents, because the rescission resulted in a windfall to Kurtz; and (4) even if Kurtz is entitled to relief, the court abused its discretion in awarding attorney fees. ALSJ also argues that the court erred in denying its motion to reconsider.

¶ 46    Kurtz did not file a response brief. If the record is simple and the claimed errors are such that the court can easily decide the appeal without the aid of an appellee's brief, the court should decide the merits of the appeal. *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976). If the appellant's brief demonstrates *prima facie* reversible error and the contentions of the brief find support in the record, we may reverse the trial court's judgment.

*Id.* Here, however, ALSJ's claimed errors do not find support in the record. Thus, we decide the appeal against ALSJ.

¶ 47                    A. ALSJ is a "Distressed Property Consultant"

¶ 48    ALSJ first argues that the Mortgage Fraud Act does not apply, because it is not a distressed-property consultant. The Mortgage Fraud Act defines a "distressed property consultant" as:

> " 'Distressed property consultant' means any person who, directly or indirectly, for compensation from the owner, makes any solicitation, representation, or offer to perform or who, for compensation from the owner, performs any service that the person represents will in any manner do any of the following:
>
>> (1) stop or postpone the foreclosure sale or *** the loss of the home due to nonpayment of taxes;
>>
>> * * *
>>
>> (6) assist the owner in foreclosure, loan default, or post-tax sale redemption period to obtain a loan or advance of funds;
>>
>> ***
>>
>> (8) save the owner's residence from foreclosure or *** loss of home due to nonpayment of taxes."  765 ILCS 940/5 (West 2014).

¶ 49    ALSJ does not challenge the trial court's interpretation of the Mortgage Fraud Act. Rather, it challenges the trial court's credibility determinations and its implicit factual determination that ALSJ worked in conjunction with Bozovic. We may not assess the credibility of witnesses, and we will reverse the court's factual determinations only if they are clearly

against the manifest weight of the evidence. *Graham v. Mimms*, 111 Ill. App. 3d 751, 767 (1982).

¶ 50    At trial and in the motion to reconsider, ALSJ raised only the general question of its affiliation with Bozovic and complicity in a scheme to strip Kurtz of the equity in her property. However, on appeal, ALSJ raises a much more technical argument concerning the absence of a business agency relationship. See, *e.g.*, *Raclaw v. Fay, Commy & Co.*, 282 Ill. App. 3d 764, 768 (1996). This technical argument is forfeited. *Poilevey v. Spivack*, 368 Ill. App. 3d 412, 417 (2006). In any case, it is unclear to us why Kurtz must prove an agency relationship as opposed to simple complicity in a scheme. Thus, we focus on the trial court's general determination that ALSJ was complicit in the scheme to defraud Kurtz and that ALSJ knew that Kurtz was the owner of a distressed property, which she sought to save by obtaining a loan.

¶ 51    ALSJ essentially argues that it did not realize that it issued the loan for the preservation of a distressed home. It believed that it issued the loan for commercial purposes to a person who intended to repair and resell the home before interest on the loan grew unconscionably steep. Further, it implies that *Kurtz* deceived *it* by signing a document averring that the loan was for commercial purposes and that she resided not in the subject property but in an apartment in Lisle. Alternatively, it implies that, if Kurtz was a victim, then the same third parties who deceived Kurtz, *i.e.*, Bozovic, Davis, and Hall, deceived ALSJ as well.[4] Kurtz, not ALSJ, signed a consulting agreement with Bozovic. Kurtz, not ALSJ, paid Bozovic a $5,700 consulting fee. Bozovic referred Kurtz to ALSJ, not the other way around. ALSJ portrays the third parties as independent actors who secured fees for themselves while referring Kurtz to ALSJ.

---

[4] ALSJ did not seek to join the third parties in the case.

¶ 52    The trial court reasonably rejected ALSJ's theory of the case.  Lee wanted the court to believe that Bozovic acted independently of ALSJ, but, when asked straightforward questions about his history with Bozovic and Hall, Lee provided nonanswers or ambiguous answers.  When asked if he had prior dealings with Bozovic, Lee answered: "We get many leads from people."  When asked if he had prior dealings with Hall, Lee answered: "No.  Unless he was the attorney from yesterday," which, of course, he was.  When recalled to the stand, Lee finally acknowledged that he had previously taken referrals from Bozovic and Davis.

¶ 53    Lee further testified that he did not participate in the Davis appraisal.  Lee's participation in the Davis appraisal would have established a link between Davis and Lee and, thus, between Bozovic and Lee.  The court reasonably rejected Lee's assertion that he did not participate in the Davis appraisal, particularly given how the testimony unfolded.  First, John Michael testified that Josh was involved in *the* appraisal of the subject property.  John Michael did not imply that more than one appraisal had been performed in conjunction with the loan.  The appraisal listed Davis as the lender/client, thus establishing a link between Davis and Lee.  After John Michael testified, Lee testified that he did not participate in the Davis appraisal.  ALSJ *did* perform an appraisal, but it was not "official" and, thus, there was no paperwork documenting the appraisal.  Lee implied that, when John Michael testified that he saw Josh during the appraisal, John Michael must have been referring to ALSJ's unofficial appraisal, not Davis's appraisal.  The court could have found it odd that: (1) Lee failed to mention the "unofficial" nature of ALSJ's appraisal the first two times he testified and mentioned it only after Kurtz showed that the documented appraisal was linked to Davis; (2) ALSJ conducted "unofficial" appraisals as a business practice; and/or (3) Davis partook in an appraisal that he did not intend to share with the company issuing the loan, ALSJ.  The court could have been further troubled by ALSJ's

witnesses' testimony that there was no furniture in the subject property during its alleged appraisal, when the Davis appraisal contained pictures of a fully furnished home. For any of these reasons, the court could have reasonably rejected Lee's attempt to explain away his link to the Davis appraisal.

¶ 54    Finally, the trial court reasonably afforded little weight to Kurtz's affidavit averring that the loan was for commercial purposes. Lee testified that he makes each loan recipient sign a similar document. In this way, Lee's own testimony corroborates Kurtz's testimony that she was presented with a series of forms to sign and that she did not draft them. Further, Lee testified that he spoke with Kurtz by phone. Thus, in order to believe ALSJ's theory of the case, the court would have had to believe that Lee, a professional lender, did not diligently inquire as to the purposes of the loan, or that, if he did, Kurtz lied and told him that the loan was for commercial purposes. The court also would have had to believe that ALSJ did not notice that Kurtz's personal checks to ALSJ listed the subject property as her address. The court resolved these credibility issues in favor of Kurtz.

¶ 55    As to credibility, the trial court stated: "The testimony of Miss Kurtz and her son were more credible than [ALSJ's] witnesses." The court did not believe that Lee was an innocent participant; rather, it believed that Lee's actions bordered on criminal: "Perhaps also in recognition of the patent illegality of the transaction and the potential criminal penalties pursuant to the Act, ALSJ's principal, Andrew Lee, testified to his advanced age and declining health." We will not upset the trial court's credibility determinations. *Mimms*, 111 Ill. App. 3d at 767.

¶ 56                                B. Kurtz is Entitled to Relief

¶ 57    ALSJ next builds upon its argument at trial that Kurtz is not the sort of owner whom the Mortgage Fraud Act is intended to protect, because she did not occupy the subject property.

ALSJ now concedes, without explanation, that whether Kurtz resided in the subject property is irrelevant under the Mortgage Fraud Act. (Rather, ALSJ's alleged *belief* that Kurtz did not reside in the subject property is relevant to its argument that it was an innocent participant and did not intend to strip Kurtz of her equity. As discussed above, we reject that argument.) ALSJ, nevertheless, attempts to save its argument.

¶ 58    ALSJ's new argument is difficult to follow, but ALSJ seems to argue that, although the trial court found that ALSJ violated the Mortgage Fraud Act, the court erroneously afforded relief under the Consumer Fraud Act. The court stated that, under the Mortgage Fraud Act, an injured party may obtain relief under the Consumer Fraud Act, which allows for any relief the court deems proper. 765 ILCS 940/55 (West 2014); 815 ILCS 505/10a (West 2014). The Consumer Fraud Act protects "consumers." *Steinburg v. Chicago Medical School*, 69 Ill. 2d 320, 328 (1977). A "consumer" contracts for, or purchases, merchandise not for resale or in the ordinary course of his trade or business, but for the use of his "household." *Brown v. Veile*, 198 Ill. App. 3d 513, 519 (1990). ALSJ now argues that Kurtz is not a "consumer." In arguing that Kurtz is not a "consumer," ALSJ again challenges Kurtz's credibility as to whether she resided in the subject property so as to use the loan for her "household."

¶ 59    This argument has at least two weaknesses. First, ALSJ does not explain why Kurtz must establish her status as a consumer. ALSJ now accepts that Kurtz is an "owner" under the Mortgage Fraud Act and that, as a victim under the Mortgage Fraud Act, Kurtz has standing to seek a remedy under the Consumer Fraud Act. 765 ILCS 940/55 (West 2014). Thus, ALSJ does not convince us that Kurtz needs the *additional* status of "consumer" in order to obtain relief under the Consumer Fraud Act.

¶ 60　Second, ALSJ's argument that Kurtz is not a consumer relies upon the challenges to Kurtz's credibility and documentary evidence that the trial court rejected.　We have already discussed the court's credibility determinations (*supra* ¶ 55).

¶ 61　As to documentary evidence, Kurtz presented: (1) pay stubs from 2009 forward; (2) February 2010 homeowner's insurance; (3) copies of personal checks to ALSJ; (4) copies of her personal income tax forms from 2009 to 2012; (5) utility bills from 2009 forward; and (6) the Davis appraisal.　Much of Kurtz's documentary evidence—tax forms, pay stubs, and bills—was unrelated to this case.　To compete with this evidence, ALSJ presented Kurtz's affidavit averring that the loan was for commercial purposes and listing the Lisle apartment as her address. However, Kurtz alleged that this very document was one of the fraudulently procured documents, part of a flurry of paperwork she was told to sign.　To take this document at face value would be to beg the question of fraud.　Particularly in combination with its credibility determinations, the court reasonably favored Kurtz's documentary evidence over ALSJ's. Therefore, we reject ALSJ's argument that Kurtz is not entitled to relief.

¶ 62　　　　　　　　　　C. Remedy Not Abuse of Discretion

¶ 63　ALSJ argues that the trial court's remedy was an abuse of discretion, because, by rescinding the mortgage documents, it awarded Kurtz a windfall.　ALSJ states that it paid $30,000 in delinquent property taxes *and* issued a $66,000 loan.[5]　Kurtz defaulted on her loan

─────────────

　　　[5] The alleged $96,000 windfall ($66,000 loan + $30,000 delinquent taxes) cited by ALSJ on appeal is different from the $42,000 windfall the trial court estimated at the attorney-fee hearing ($66,000 loan - $8,000 delinquent taxes and additional fees associated with the transaction).　It appears that ALSJ chose the $30,000 figure because, in November 2013, it paid $28,000 to Du Page County to meet the deadline for the redemption period on a tax sale of the

and ALSJ paid taxes on the subject property, but Kurtz kept the subject property. ALSJ argues that, rather than put the parties in the same position that they were in before the contract, the court's rescission put ALSJ in a worse position and Kurtz in a better position. See *Puskar v. Hughes*, 179 Ill. App. 3d 522, 528 (1989) (a court may rescind a contract so as to return the parties to their precontract status). Rescission is an equitable remedy, and we will not disturb the trial court's decision to rescind an agreement unless it abused its discretion. *Klucznik v. Nikitopoulos*, 152 Ill. App. 3d 323, 327 (1987).

¶ 64    ALSJ hinted at, but did not develop, the windfall argument in its motion to reconsider, and, therefore, the argument is forfeited. *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536 (1996). Rather, after the trial court denied the motion to reconsider, the *court* raised the issue of Kurtz's potential windfall when deciding whether it should negate her attorney-fee award. The court suggested that it would cancel the award in light of the potential windfall, *if* the parties would "settle" the case and "bring an end to the situation." ALSJ rejected this suggestion. The court then noted that ALSJ was the wrongdoer in this case and that, therefore, regardless of the potential windfall, it would award Kurtz's attorney fees. Indeed, from Kurtz's perspective, that she unwittingly accepted now-illiquid funds, following various tax payments and home repairs, does not mean that she has cash on hand to pay attorney fees to defend against a six-figure judgment. These circumstances do not alert us to an injustice that would compel us to excuse

---

property. ALSJ made this payment almost two years after Kurtz filed her counterclaim for fraud. ALSJ presumably made this payment so that it would ultimately be able to acquire the property. Continuing to pay expenses, in furtherance of what the court later determined to be an equity-stripping scheme, was at ALSJ's own peril.

ALSJ's forfeiture. And, even if the issue were not forfeited, the court did not abuse its discretion under these circumstances by consciously declining to account for the potential windfall.

¶ 65                          D. Attorney Fees

¶ 66    ALSJ argues that the trial court was precluded from awarding Kurtz attorney fees, because, although Kurtz requested attorney fees, she did not cite section 10a(c) of the Consumer Fraud Act. 815 ILCS 505/10a(c) (West 2014). Section 10a(c) of the Consumer Fraud Act allows for the award of attorney fees at the discretion of the trial court. *Id.* ALSJ cites no case law to explain why the failure to cite section 10a(c) should preclude Kurtz from receiving fees. As we have already discussed, victims under the Mortgage Fraud Act may receive relief under the Consumer Fraud Act. Kurtz cited the Mortgage Fraud Act, and the court found her to be a victim. Attorney fees are a form of relief under the Consumer Fraud Act. Thus, the court was not precluded from awarding Kurtz attorney fees.

¶ 67    ALSJ next argues that, even if the trial court was permitted to award attorney fees, it abused its discretion in so doing. See *Krautsack v. Anderson*, 223 Ill. 2d 541, 554 (2006). ALSJ contends that it should not have to pay Kurtz's fees, because it lacked "culpability and bad faith." It also argues that "the Trial Court's already-existing decision to rescind the Note and Trust deed 'militate against an award of fees' " (citing *Krautsack*, 223 Ill. 2d at 558 (circumstances might militate against the award of fees to the prevailing party)).

¶ 68    We reject ALSJ's abuse-of-discretion argument. We reject ALSJ's first point, because the trial court found that ALSJ *did* act with bad faith. We reject ALSJ's second point, because it is an attempt to resurrect its windfall argument. Again, the trial court suggested forgoing the attorney-fee award in light of the potential windfall, but ALSJ rejected the suggestion in order to take its chance at pursuing further gain. See, *e.g.*, *McMath v. Katholi*, 191 Ill. 2d 251, 255

(2000) (a party cannot complain on appeal about an action to which it consented). Under these circumstances, the court did not abuse its discretion in awarding attorney fees.

¶ 69                    E. Denial of Motion to Reconsider was Proper

¶ 70    Finally, ALSJ argues that the trial court erred in denying its motion to reconsider. When, as here, a motion to reconsider is based on the trial court's application of existing law, as opposed to based on new facts or legal theories not presented in the prior proceedings, our review is *de novo*. *People v. $280,020 U.S. Currency*, 372 Ill. App. 3d 785, 791 (2007).

¶ 71    ALSJ argues that the trial court misapplied existing law when it determined that ALSJ was a "distressed property consultant," Kurtz was entitled to relief, and Kurtz was credible. ALSJ already raised these points in other portions of the appeal, and we rejected them. The trial court did not err in denying the motion to reconsider.

¶ 72                            III. CONCLUSION

¶ 73    For the aforementioned reasons, we affirm the trial court's judgment.

¶ 74    Affirmed.