# Illinois Official Reports

## Appellate Court

---

**Wynn v. Illinois Department of Human Services, 2017 IL App (1st) 160344**

---

| | |
|---|---|
| Appellate Court Caption | JERRY WYNN, Plaintiff-Appellee, v. THE ILLINOIS DEPARTMENT OF HUMAN SERVICES, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-16-0344 |
| Filed | May 23, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-L-9430; the Hon. James E. Snyder, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Chicago (David L. Franklin, Solicitor General, and Valerie Quinn, Assistant Attorney General, of counsel), for the People.<br><br>Miriam Hallbauer and Jonathan DeLozano, of LAF, of Chicago, for appellee. |
| Panel | PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justices Neville and Pierce concurred in the judgment and opinion. |

**OPINION**

¶ 1    For 13 years Jerry Wynn worked as a contract employee for the Illinois Department of Human Services (DHS). Then his contract was not renewed. Wynn sued DHS under the whistleblower provision of the State Officials and Employees Ethics Act (Ethics Act) (5 ILCS 430/1-1 *et seq.* (West 2014)). He contended that DHS terminated him in retaliation for reporting an improper expenditure to an auditor. According to DHS, Wynn and others were terminated under an agreement between the State and the American Federation of State and Municipal Employees (AFSCME) to place union employees in positions occupied by contractors and vendors.

¶ 2    After a one-day bench trial, Wynn prevailed. The trial court held Wynn proved that his protected activity—reporting an improper payment to the auditor—was a contributing factor in DHS not renewing his contract and terminating him.

¶ 3    DHS argues the trial court erred as (i) nonrenewal of a fixed-term contract does not amount to unlawful retaliation under the Ethics Act and (ii) the findings were against the manifest weight of the evidence. We affirm. DHS committed retaliation under the Ethics Act's definition of "retaliation," which includes a change in the terms or conditions of employment. Further, the trial court's findings square with the manifest weight of the evidence.

¶ 4                                    BACKGROUND

¶ 5    The evidence at trial established that Jerry Wynn began working as a contract employee for DHS in December 1997. Wynn was the program administrator of the Chicago Healthy Start Program, a federal grant program to reduce infant mortality and improve perinatal outcomes. Wynn's duties included assuring compliance with grant requirements and preparing grant applications. Wynn worked in the Bureau of Maternal and Infant Health, an office in the division of Community Health and Prevention (CHP). Wynn was widely praised by his supervisors, and his job performance was deemed excellent.

¶ 6    Wynn worked under successive one-year personal service contracts with DHS, except when, for budget reasons, he was placed on the payroll of DHS vendors from 2003 to 2006 (Springfield Urban League) and from July 2009 through June 2010 (Catholic Charities). Whether under a personal service contract or on a vendor payroll, Wynn's position, day-to-day responsibilities, and supervisor remained constant. Wynn expected his contract would be renewed every year but he knew he was not entitled to renewal.

¶ 7                                The Fletcher Process

¶ 8    In early 2009, DHS began negotiating with AFSCME to replace a number of contract employees with AFSCME members. This change was prompted by a lawsuit between AFSCME and DHS, which alleged, in part, that the State had contractors and vendors doing union work while union employees were being laid off. The circuit court issued an injunction, ordering the state and the union to work with a mediator to resolve the issue, which resulted in a mediated resolution agreement (MRA). Under the MRA, the state was to make "all reasonable efforts to terminate *** personal service and vendor contracts" that violated union agreements "no later than December 31, 2010."

¶ 9        DHS referred to the process of converting contract positions to union jobs as the "Fletcher process" (after the arbitrator). Jeffrey Kunz, DHS's director of Labor Relations, and his staff negotiated with the union over contract and vendor positions. Kunz's staff compiled a list of DHS personal service contractors and vendors who arguably performed union work. The list, referred to as a "grid," included 700 to 800 names. It was fluid; contractors and vendors continually started and ended during the process, and new names were added.

¶ 10       Beginning in August 2009, Kunz and his staff met with union representatives every other month to determine, one-by-one, whether someone on the grid should be replaced by a member of the union. Kunz and his staff had a document listing each contractor's title, scope of duty, salary, and start and end dates. If the union took the position that a contract position should be eliminated because the classification involved union work, Kunz said "that was pretty much the end of the discussion then. We had no argument to say that was our work." He said that once a position was designated as union work, the contractor could be extended temporarily but could no longer be offered a year-long contract, as that would violate the collective bargaining agreement. DHS could retain contract workers who were on short-term contracts of less than one year and those who performed professional, specialized work, such as information technology and the practice of medicine.

¶ 11       Vendors did not have job classifications. Kunz said that it took more time to determine whether a vendor had to be terminated. Kunz referred to Article 29 of the Memorandum of Understanding with the union, which provided that an employer could "contract out any work it deems necessary or desirable because of greater efficiency, economy, or other related factors." Kunz said that Article 29 applied only to vendors and gave the State some leeway in keeping a vendor, even if his or her work resembled a union classified job.

¶ 12       Kunz's job in the Fletcher process was "to advocate for management on behalf of DHS." DHS had an internal "Fletcher group," some 20 to 25 liaisons representing divisions across DHS, helping streamline the process. The liaisons would explain which contractors they believed were not doing union work and why; Labor Relations would present that argument to the union. Dan Blair, CHP's fiscal manager, and Diane Deppe, a budget manager, were CHP's liaisons to the Fletcher group. At trial, Kunz testified that liaisons only provided Labor Relations with information regarding salaries, contracts, and other necessary information, but acknowledged that in his deposition he said liaisons made recommendations about which contract employees should be retained.

¶ 13       Blair testified that as liaison he regularly attended Fletcher group meetings and met separately with Kunz on several occasions. Kunz generally wanted to know where contract employees worked, who they reported to, and their scope of duties. Blair and Kunz discussed contractual information about employees—"the name, the job title, what it equated to, what their function—you know just details about the job." Blair could not recall whether he offered opinions about specific employees or played any role in decisions on whether a contract violated the union's collective bargaining agreement. Nor could Blair recall whether Kunz asked him if CHP wanted to keep certain contract employees. Blair agreed that individual employee's names were discussed at the meetings, but said "it was more discussed on position rather than names." Blair also agreed that they would have discussed Wynn's position, but he could not recall anything specific that he and Kunz talked about. Blair acknowledged that he likely talked to Wynn's supervisors about Wynn's position, but could not recall the substance of those conversations.

¶ 14     Blair admitted that on January 14, 2010, he sent an e-mail to the DHS Director, Kunz, and others stating that 15 names, including Wynn's, had been added to the Fletcher grid. He did not know why they were added or who added them. Although the decision not to renew Wynn's contract was part of the Fletcher process, Blair could not recall who made the decision, when it was made, when he heard about it, or who told him. Blair also could not recall if anyone told him that he or she did not want Wynn to continue in his position.

¶ 15     Diane Deppe, CHP budget manner reported to Blair. She said that only she and Blair provided information about whether there was money in the budget to continue to fund contract positions.

¶ 16     Every job in the state system has a working title and classification title. Wynn's working title was "Healthy Start Program Administrator." His classification title was Public Service Administrator (PSA) Option 6. PSA Option 6 became a union title on December 2, 2008, when the Illinois Labor Relations Board granted AFSCME's petition to add it to the category of union titles and the state agreed, with the exception of about 100 jobs. Wynn's name appeared on a list of contractors and vendors gathered by the Fletcher group on August 24, 2009.

¶ 17                                    The Audit

¶ 18     In April 2009, around the same time the Fletcher process began, the Illinois Office of Internal Auditors began auditing Healthy Start. Wynn's supervisor, Glendean Sisk, asked Wynn to "take the lead" and handle the audit's "clinical side," including issues regarding "client care." On November 9, 2009, an auditor called Wynn and asked about a nearly $100,000 payment to the Springfield Urban League. Wynn told the auditor that he had not authorized the payment and that the Springfield Urban League was not an approved Healthy Start contractor. Wynn told the auditor he thought Dan Blair was responsible for the payment as Blair issued checks to Healthy Start grantees.

¶ 19     Later that day, Wynn sent an e-mail to Sisk, Myrtis Sullivan, CHP's associate director, and Ivonne Sambolin, CHP's director, informing them of his conversation with the auditor. Sullivan sent a reply e-mail thanking Wynn and asking him to inform them of further inquiries. Sisk forwarded Wynn's e-mail to Blair (and copied the other original recipients and Wynn), asking Blair what he knew about the payment. In a reply e-mail, Blair said the $100,000 payment was for "technical assistance" and was "the contract [Wynn's assistant] is paid from." Wynn wrote a reply e-mail correcting Blair. Wynn's assistant worked for Catholic Charities, and not Springfield Urban League, and she did not begin working for him until May 2008. Blair replied. He conceded that Wynn was correct, but thought the payment should be considered part of "technical assistance." Wynn again responded, telling Blair there was no technical assistance from Springfield Urban League. That was Wynn's last communication with Blair about the payment.

¶ 20     The next day, Wynn saw Myrtis Sullivan, and she said to him, "We['ve] got to meet with you, me and the director [are] going to meet with you. You are going to make us lose Healthy Start." Wynn said he asked her "Why? Because I wouldn't go along with Dan Blair?" and Sullivan shook her head and said, "Yes." Wynn told Sullivan he would not lie to an auditor, and Sullivan repeated that she and the director were going to meet with him, and walked away. Sullivan had no recollection of this conversation but recalled that she was not upset at Wynn for talking to the auditor or for sending the e-mails about the audit and the improper payment.

¶ 21    Wynn also saw Sisk that morning. She said to him, "Why did [you] have to say anything? I'm sure this was just a one-time thing. Dan just needed to find some money." Wynn testified that Sisk criticized him for cooperating with the auditor and said that he should have told the auditor, "I'll just let Dan Blair answer that." Sisk testified that she was not angry with Wynn but thought Blair should handle questions about the audit. She also said Blair expressed "frustration that he was not being allowed to respond to the auditor about this" and was perturbed that Wynn did not refer the auditor to him.

¶ 22    Also that day, Sisk received an e-mail from Deppe regarding a state-issued cell phone that had been given to Wynn. Deppe explained that "[w]e were supposed to get the cell phones back from employees that were not State employees." Deppe reminded Sisk that "some time ago [Blair] sent an email to you regarding returning [Wynn's] cell phone since he is not a state employee." Sisk answered that Wynn told her he turned in the cell phone the previous week.

¶ 23    In March 2010, Wynn, Sisk, Blair, and others participated in a telephone audit exit conference at which the auditors provided a summary of their findings. The day before, Sisk called Wynn and told him to "be quiet as a church mouse" during the conference call and go along with whatever Blair says. Sisk testified that neither she nor Wynn knew why the improper payment was made, and she wanted Wynn to let Blair explain it. During the call, one of the auditors asked Wynn about the improper payment, and he replied, "let Dan Blair handle it" and said nothing else about the matter.

¶ 24    Blair remembered the 2009 audit of the Healthy Start program but could not recall much about it. He could not recall Wynn's emails informing him that he was wrong about the payments or an e-mail from the auditor asking him to explain the payment. Blair acknowledged he forwarded that e-mail separately to Sullivan and Sambolin and asked them to call him, but he could not recall if they did.

¶ 25    Blair denied personally making the payment to Springfield Urban League and said it was an error by someone on his staff. He could not recall when he first told anyone else that the payment was in error but said it would make sense that he told Sullivan and Sambolin in November 2009. He could not recall if he informed the auditor or Wynn that the payment was made in error. He discussed the error with Sisk but could not recall if he told her he was perturbed with Wynn. He thought the auditor's questions should have been directed to him but said he was not "irritated" that Wynn answered and did not think Wynn did anything wrong.

¶ 26    Deppe testified that she was aware of the 2009 audit and, although Blair never discussed it with her, she knew Blair was unhappy with some of Wynn's responses to the auditor. She said that Wynn's participation in the audit was not discussed at the Fletcher meetings and did not play a role in the information provided to Labor Relations.

¶ 27    On May 12, 2010, after the audit, Myrtis Sullivan sent DHS Director Sambolin an e-mail, noting Sisk's concern with (i) the inaccuracy of Blair's responses to the audit, (ii) Blair's attachment of blame for improper use of Healthy Start funds to the Bureau of Maternal and Infant Health staff, and (iii) the use of the money to "cover bills that were due."

¶ 28                                    Wynn's Termination

¶ 29    In April 2010, Wynn met with Sullivan and Sambolin, who told him his employment would terminate as of December 31, 2010, because his position was being given to a union member. Sullivan was upset about losing Wynn and contacted a federal officer involved in the

Healthy Start program to see if Wynn could be retained. She did not speak to anyone in Labor Relations about retaining him.

¶ 30    Sisk testified that in early 2010, she, Blair, and Kunz met to discuss Wynn's position. She described Wynn's day-to-day responsibilities, while Blair provided minimal information about Wynn's contract. Sisk could not recall advocating for keeping Wynn but had no reason to believe she did not. She said she learned in April 2010 that Wynn's contract would be terminated. She requested that his contract be extended until December 31, 2010, because the division needed someone in that position. Wynn was given a final contract, from July 1, 2010 until December 31, 2010, which paid a higher rate than his previous contracts.

¶ 31    Sisk encouraged Wynn to apply for the position when it was posted, which he did, but the position went to someone else. Sisk said that in 2014, all Healthy Start programs were defunded, and CHP's application for new funding was not accepted. Sisk also testified that two contract employees—Joanne Kelly and Xochild Martisoryan, personal service administrators who reported to her and had been listed on the Fletcher grid with Wynn—stayed with CHP after December 31, 2010, but were moved to the payroll of a state vendor.

¶ 32    On August 21, 2012, Wynn filed a complaint, which was later amended, alleging, among other things, that DHS violated the whistleblower section of the Ethics Act. (Wynn also named Sisk, Sullivan, Sambolin, and Blair as defendants. The trial court dismissed all individual defendants and all counts other than the one brought under the Ethics Act.) Specifically, Wynn contended that DHS violated section 15-10 of the Ethics Act, prohibiting "retaliatory action against a State employee" who "[d]iscloses or threatens to disclose to a supervisor or to a public body an activity *** of any officer, member, State agency, or other State employee that the State employee reasonably believes is in violation of a law, rule, or regulation." 5 ILCS 430/15-10(1) (West 2014).

¶ 33    DHS defended that non-renewal of a fixed-term contract did not constitute a retaliatory action under the Ethics Act. "Retaliatory action" means "reprimand, discharge, suspension, demotion, denial of promotion or transfer, or change in the terms or conditions of employment of any State employee, that is taken in retaliation for a State employee's involvement in protected activity as set forth in section 15-10." 5 ILCS 430/15-5 (West 2014). Moreover, DHS denied a causal connection between Wynn's report to the auditor and the decision to terminate his contract, pointing to the ongoing negotiations with AFSCME.

¶ 34                                        The Verdict

¶ 35    The trial court held that Wynn engaged in protected conduct under the Ethics Act when he informed the auditor and his supervisors about the improper payment to the Springfield Urban League. The trial court found that Wynn reasonably believed he was reporting a violation of federal law or regulations and proved by a preponderance of the evidence that his protected conduct constituted a contributing factor in his termination.

¶ 36    The trial court found the evidence showed Blair had a motive to retaliate based on Deppe's testimony that (i) Blair was unhappy about Wynn's response to the audit, which Sisk corroborated, and (ii) she likely sent the e-mail asking for Wynn's cell phone at Blair's behest. The trial court also found evidence of motive in Wynn's uncontroverted testimony that Sullivan told him that he was risking the Healthy Start program and Sisk's instruction to be quiet during the audit exit conference.

¶ 37    As to Blair's involvement as a liaison to the Fletcher group, the trial court said that it gave him the means to retaliate against Wynn, since Kunz relied on liaisons to determine what position to take in negotiations with the union. The trial court noted that the ongoing practice of transferring contractors to vendors discredited DHS's claim that Wynn's job classification required that his position be converted to a union position. Two of Wynn's fellow employees were allowed to stay by way of this manner.

¶ 38    The trial court concluded that DHS failed to prove by clear and convincing evidence that the Fletcher process would have eliminated Wynn's job regardless of Wynn's protected conduct. The trial court stated that DHS's position would require him to believe that Blair had acted in a neutral manner in transmitting information to Labor Relations about Wynn's job. But the trial court said "I do not believe Blair's testimony. He was not credible."

¶ 39    Three months later, after briefing, the trial court entered an order awarding Wynn back pay in the amount of over $300,000, which it doubled under the Act. The court also imposed 5% interest on the back pay and awarded attorney fees for a total award of $782,253.54.

¶ 40                                                    ANALYSIS
¶ 41                                      Retaliation under the Ethics Act
¶ 42    It is undisputed that Wynn engaged in statutorily protected activity under the Ethics Act when he told an auditor that a payment to a DHS vendor was unauthorized. It is also undisputed that contract employees are covered under the Ethics Act, which defines an employee to include "any person employed *** pursuant to a contract." 5 ILCS 430/1-5 (West 2014). DHS contends, however, that Wynn has no cause of action because a decision not to renew an employee's fixed term contract does not constitute "retaliation" under the Ethics Act.

¶ 43    A fundamental rule of statutory construction requires ascertaining and giving effect to the legislature's intent. *People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36, 45 (2002). The plain and ordinary meaning of the statutory language best provides the legislature's intent. *Id.* Where the language is clear and unambiguous, we apply the statute without resort to other aids of statutory construction and apply it as written. *Id.* at 45-46. A court may not annex new provisions or substitute different ones or read into the statute exceptions, limitations, or conditions unexpressed by the legislature. *Hines v. Department of Public Aid*, 221 Ill. 2d 222, 230 (2006). The construction of a statute presents a question of law that we review *de novo*. *In re Estate of Dierkes*, 191 Ill. 2d 326, 330 (2000).

¶ 44    DHS asserts that because the definition of "retaliatory action" does not use the word "include" or "including," the plain terms limit retaliation to seven actions and cannot be expanded. See *People v. Perry*, 224 Ill. 2d 312, 328 (2007) (use of "includes" or "including," "when followed by a listing of items, means that the preceding general term encompasses the listed items, but the list is not exhaustive").

¶ 45    Wynn acknowledges that no Illinois court has held that non-renewal of a contract constitutes "retaliatory action" under the Ethics Act. But Wynn likens the anti-retaliation provision to the anti-retaliation provision of Title VII of the federal Civil Rights Act of 1991 (42 U.S.C. § 2000e-3(a) (2012)). In the absence of Illinois cases construing the Ethics Act, we may look for guidance to federal courts interpreting analogous statutes. See *Hosick v. Chicago State University Board of Trustees*, 924 F. Supp. 2d 956, 974-75 (N.D. Ill. 2013) ("because the anti-retaliation portion of the Ethics Act is analogous to the anti-retaliation portion of Title VII,

the Court considers judicial interpretations of Title VII in resolving the issues presented in this case"). Under Title VII, an "adverse employment action" is one that "significantly alters the terms and conditions of employment." *Threatt v. Donovan*, 380 Fed. App'x. 544, 548 (7th Cir. 2010). Wynn contends that federal courts have found that non-renewal of a contract constitutes an adverse employment action (see, *e.g.*, *Leibowitz v. Cornell University*, 584 F.3d 487, 501 (2d Cir. 2009) ("non-renewal of an employment contract itself is an adverse employment action")), and so we should find that non-renewal of a contract constitutes retaliatory action under the Ethics Act.

¶ 46    DHS asserts, however, that section 15-10 of the Ethics Act should be equated to the tort of retaliatory discharge, which has been limited by Illinois courts and precludes an employee from suing for non-renewal of a fixed term contract. DHS cites *Crowley v. Watson*, 2016 IL App (1st) 142847, one of the few cases to interpret the Ethics Act, in which this court stated that a claim of discharge in retaliation for protected activity is analogous to the tort of retaliatory discharge, a narrow exception to the at-will employment. *Id.* ¶ 32. DHS asserts that it is significant that, in the context of retaliatory discharge, this court has held a contract employee who engaged in whistleblowing activity may not bring a cause of action for retaliatory discharge when an employer fails to renew a written fixed-term employment contract. See *Krum v. Chicago National League Ball Club, Inc.*, 365 Ill. App. 3d 785, 788-89 (2006); *Bajalo v. Northwestern University*, 369 Ill. App. 3d 576, 584-85 (2006).

¶ 47    In *Krum*, the plaintiff was an assistant athletic trainer for the Chicago Cubs, working under a one-year employment contract. Krum alleged that after he complained to management about violations of the Illinois Athletic Trainers Practice Act (225 ILCS 5/4 (West 2004)), the Cubs "terminated" him in retaliation, even though they continued to pay his salary until the date his employment contract expired. *Krum*, 365 Ill. App. 3d at 787. We held, consistent with the supreme court's desire to restrict the common law of retaliatory discharge, that "absent a statutory basis, contractual employees, such as Krum, cannot bring a claim for retaliatory discharge when employers fail to renew an employment contract." *Id.* at 790. Noting that the Athletic Trainers Practice Act, on which Krum relied, did not contain any language "prohibiting retaliatory employment conduct," the appellate court dismissed Krum's claim. *Id.*

¶ 48    Similarly, in *Bajalo*, 369 Ill. App. 3d at 580, we considered whether a contract employee may bring a claim for retaliatory discharge when the employer fails to renew the employee's contract. The employee was hired as a research associate. The university renewed the employee's one-year contract twice; however, after the employee reported improper laboratory procedures that she believed jeopardized the health and welfare of the animals to her supervisors and to regulatory agencies, the university declined to renew her contract, and she was dismissed after the term of her contract ended. *Id.* at 578. The university filed a judgment on the pleadings. Recognizing " 'this is a new and novel situation,' " the trial court certified the following question for interlocutory appeal: " 'May a contract employee who engaged in protected whistleblowing activity bring a cause of action for retaliatory discharge when the employer fails to renew the employee's written contract[?]' " *Id.* at 579.

¶ 49    The appellate court agreed that the employee engaged in protected whistleblowing activity—exercising her rights under the Federal Animal Welfare Act (7 U.S.C. § 2131 *et seq.* (2000))—but, after reviewing Illinois Supreme Court cases that have limited the scope of the tort of retaliatory discharge, the decision in *Krum*, and decisions in other jurisdictions, we refused to extend it to a claim of failure to renew an employment contract. *Id.* at 582-85. Even

though the employee had had a working relationship with the employer, the employer was not liable for retaliatory discharge for choosing to discontinue a future employment relationship. *Id.* at 585. "In light of the clear trend of retrenchment reflected in our supreme court decisions \*\*\*, we agree with the position taken in *Krum*." *Id.* See also *Darchak v. City of Chicago Board of Education*, 580 F.3d 622, 628 (7th Cir. 2009) (noting Illinois appellate courts have expressly refused to extend reach of retaliatory discharge tort to cover nonrenewal of fixed-term contract).

¶ 50    DHS asserts that—like the plaintiffs in *Krum*, *Bajalo*, and *Darchak*—Wynn held a series of fixed-term one-year contracts, knew that each contract would expire, and was not entitled to a new contract unless DHS decided to offer him one. Further, DHS contends that allowing the contract to expire does not amount to "discharge" under the Ethics Act because Wynn had no expectation that it would be renewed. DHS asks us to decline to read "failure to renew a fixed term contract" into the definition of "retaliatory action," which DHS claims is exhaustively defined in section 15-5.

¶ 51    Wynn contends that DHS's reliance on *Crowley* is misplaced. First, Wynn notes that *Crowley* involved neither a contract employee nor does its holding relate to contract employees. Moreover, Wynn asserts we cannot "graft" the tort of retaliatory discharge onto the Ethics Act, as doing so would make some of its language superfluous. Specifically, Wynn notes that under the tort, an employee can prevail only if he or she has been discharged, while the Ethics Act applies to an employee who has been reprimanded, demoted, or denied a promotion. He asserts that under DHS's interpretation, these prohibitions would be rendered naught, which we must avoid in interpreting a statute.

¶ 52    We agree with Wynn. As noted, the Ethics Act covers contract employees. And although, as DHS asserts, section 15-5 does not expressly include nonrenewal of a contract in defining retaliatory action, it includes "change in the condition of employment," a phrase akin to Title VII's "significantly alters the terms of employment." Nonrenewal of a contract qualifies as an "adverse employment action" under Title VII because it is a "change in the terms and conditions of employment." Hence, nonrenewal constitutes retaliatory action. Also, as Wynn asserts, courts limited the scope of the tort of retaliatory discharge for reasons that are inapplicable to cases arising under the Ethics Act. Courts wanted to circumscribe the tort due to uneasiness with an " 'ill-defined, and potentially all-encompassing concept of retaliatory conduct or discrimination' "; otherwise, courts would " 'become increasingly involved in the resolution of workplace disputes.' " *Bajalo*, 369 Ill. App. 3d at 584 (quoting *Zimmerman v. Buchheit of Sparta, Inc.*, 164 Ill. 2d 29, 39 (1994)). But that sort of uneasiness does not pertain to the more narrowly tailored Ethics Act, which addresses a specific problem related to whistle blowing.

¶ 53    The Ethics Act seeks to encourage employees, including contract employees, to report wrongdoing without fear of reprisal. There is no question that the State has discretion to not renew an employee's contract. But to further the purposes of the Ethics Act, employees subject to renewal must be protected from pretextual discharge when the evidence supports a finding that the decision not to renew was motivated by animus for whistleblowing activity. Moreover, employees like Wynn, who lack protection from a union, can be more susceptible to intimidation by the threat of nonrenewal. Accordingly, a decision by the State not to renew a contract employee who engages in protected activity may constitute "retaliation" under the

Ethics Act.

¶ 54                                    Evidence to Support Verdict

¶ 55        Alternatively, DHS argues that the trial court's findings were against the manifest weight of the evidence. Further, DHS contends that some alleged retaliatory actions against Wynn could not be retaliatory—both reclassifying Wynn's position and requesting his cell phone occurred before he talked to the auditor. Lastly, DHS asserts that Wynn's contract would not have been renewed regardless, since his position was converted to a union job to comply with the agreement with AFSCME.

¶ 56        A trial court's judgment after a bench trial will not be reversed unless it is against the manifest weight of the evidence. *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, ¶ 25. "Against the manifest weight of the evidence" means that, based on the record, the judgment is arbitrary, unreasonable, not based on evidence, or the opposite conclusion is apparent. *Munson v. Rinke*, 395 Ill. App. 3d 789, 795 (2009). We give great deference to the fact finder's credibility determinations and will not substitute our judgment for the fact finder's. *Samour, Inc. v. Board of Election Commissioners*, 224 Ill. 2d 530, 548 (2007) ("fact finder is in the best position to evaluate the conduct and demeanor of the witnesses"). "[W]e may affirm the judgment of the trial court on any basis in the record, regardless of whether the trial court relied upon that basis or whether the trial court's reasoning was correct." *Alpha School Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 734 (2009). Nevertheless, we may not overturn a judgment on the basis that we disagree with it or that, as the trier of fact, we might have arrived at a different result. *Eychaner v. Gross*, 202 Ill. 2d 228, 271 (2002).

¶ 57        Under section 15-10, no officer, member, state employee, or state agency shall take any retaliatory action against a state employee because that employee discloses, or threatens to disclose, any activity by an officer, member, state agency, or other state employee that the state employee reasonably believes is in violation of a law, rule, or regulation. 5 ILCS 430/15-10(1) (West 2014). "Retaliatory action" is defined as "reprimand, discharge, suspension, demotion, denial of promotion or transfer, or change in the terms or conditions of employment of any State employee, that is taken in retaliation for a State employee's involvement in protected activity, as set forth in Section 15-10." 5 ILCS 430/15-5 (West 2014).

¶ 58        State employees, which include contract employees, may establish a violation only by showing (i) they engaged in conduct described in section 15-10 and (ii) that conduct was a "contributing factor" in the retaliatory action. 5 ILCS 430/15-20 (West 2014). A defendant may refute the allegation of retaliation by demonstrating by clear and convincing evidence that the same unfavorable personnel action would have occurred in the absence of that conduct. *Id.* Illinois courts have yet to define "contributing factor" under section 15-20, but federal courts interpreting that phrase under employment statutes have found that a "contributing factor" refers to something less than a substantial or motivating factor. *Addis v. Department of Labor*, 575 F.3d 688, 691 (7th Cir. 2009) (contributing factor standard provides complainant lower hurdle to clear than bar set by other employment statutes). A " 'contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision.' " *Araujo v. New Jersey Transit R. Operations, Inc.*, 708 F.3d 152, 158 (3d Cir. 2013) (quoting *Ameristar Airways, Inc. v. Administrative Review Board*, 650 F.3d 562, 567 (5th Cir. 2011). Federal courts also recognize that an employee usually must rely on circumstantial evidence, including suspicious timing, ambiguous statements, and "other bits

and pieces from which an inference of discriminatory intent might be drawn." *Troupe v. May Department Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

¶ 59    The parties agree that Wynn's conversation with the auditor about the improper $100,000 payment constituted protected activity under the Ethics Act. They disagree, however, about whether the evidence supported the finding that this protected activity sufficed as a "contributing factor" to his being terminated.

¶ 60    Before examining the finding of facts surrounding the nonrenewal of Wynn's contract, we address DHS's contention that the trial court identified two additional retaliatory acts—the reclassification of Wynn's job title (which occurred in 2008) and Deppe's attempt to retrieve Wynn's cell phone (a follow-up to a request that had been made before Wynn spoke to the auditor). DHS contends that it is contrary to the law and common sense and was contrary to the manifest weight of the evidence to find that actions taken ahead of the protected activity could be in retaliation for it. We agree; nonetheless, the record shows that the trial court did not consider these actions as retaliation, but as support for Wynn's assertion that Blair was angry at him for talking to the auditor. The trial court did not deem the job classification a retaliatory action; rather, in its findings of fact, it cites Wynn's reclassification to show that the Fletcher process was not identity neutral, as DHS claimed. The point was that Blair's office sent Wynn's job description to the Classifications Unit as well as his resume, a copy of his driver's license, and insurance card.

¶ 61    As for Deppe's e-mail asking for Wynn's cell phone, again, the trial court did not consider this as a retaliatory action, but as evidence that Blair was angry at Wynn for talking to the auditor. The trial court notes that Deppe testified that "Blair was displeased with Wynn's response to the audit," and that Sisk said Blair was "perturbed" and "expressed his frustration" about "not being allowed to respond to the auditor." The trial court found that Deppe's e-mail, which she said she probably sent at Blair's request, was "consistent with testimony from other people that he was angry." This was circumstantial evidence of motive, and not a finding of retaliatory action.

¶ 62    Turning to the sufficiency of the evidence, the trial court relied on both direct and circumstantial evidence to support its finding that Blair was angry with Wynn and retaliated by ensuring that he would be terminated. As noted, several witnesses testified that Blair was upset about Wynn's conversation with the auditor. Blair denied being upset or irritated with Wynn, but the trial judge, who was in the best position to evaluate Blair's conduct and demeanor, viewed Blair's testimony as "not worthy of belief." The trial court sits in a much better position than we to determine witness credibility. *Samour, Inc.*, 224 Ill. 2d at 548.

¶ 63    As for Blair's actions, Wynn did not need to show the Blair caused him to lose his job but was a "contributing factor." 5 ILCS 430/15-20 (West 2014). The trial court found the evidence established that Blair played a role in the classification of Wynn's job, since (i) the classifying unit acted on information supplied by Blair and reported back to him, (ii) Blair, as a liaison to Labor Relations, could determine the position DHS took with the union about keeping employees, and (iii) the process was subjective and diffuse enough to allow Blair to use it to retaliate against Wynn.

¶ 64    DHS asserts that the trial court erred in making this finding because Blair had no role in classifying Wynn's position, which was performed by the Classification Unit without reference to employees' names. Moreover, DHS notes that Wynn's job was classified PSA Option 6 in 2008, before the audit. DHS also contends that the record does not support the trial

court's finding that Blair advised Kunz about which employees to keep and that Kunz advanced Blair's arguments with the union. DHS also refers (i) to Deppe's testimony that at Fletcher group meetings with Blair, he only provided information about whether DHS had enough money for certain positions and (ii) to Kunz not testifying that Blair tired to influence him or advocate for or against retaining Wynn.

¶ 65 We agree that Blair played no role in classifying Wynn's position as PSA Option 6, and it could not logically be deemed as retaliatory action. The record, however, belies DHS's contention that the Fletcher process was identity neutral and dependent solely on job classification. Kunz testified that his job was to keep as many contract employees as the liaisons wanted, and the liaisons' job was to give Labor Relations the argument for keeping a contract employee. If the determination was based on job classification alone, Kunz and the liaisons would have no argument for retaining contract employees whose job titles were deemed union work. Moreover, Sisk testified that she met with Kunz and Blair to discuss Wynn's role and responsibilities and his contract, which at that time was with a vendor, Catholic Charities. If the determination was based solely on job classification, this type of meeting would have been unnecessary.

¶ 66 As for Blair's role, as CHP's liaison to the Fletcher group, he met privately with Kunz to discuss certain positions. In his deposition, Kunz acknowledged that liaisons made recommendations about which contractors should or should not be retained and testified that if a liaison told him they had no problem eliminating a contractor, the contractor was terminated. Further, Kunz testified that Labor Relations "negotiated" with the union and, although Kunz said that a PSA Option 6 would be a tough sell, he did not rule it out.

¶ 67 DHS also contends that Blair lacked a motive to retaliate. There were no adverse consequences to him or anyone else for the improper payment, and DHS points to Blair's testimony that audit findings were fairly common and were only serious if they involved an intentional misuse of funds. Also, DHS refers to Sisk's testimony that there were three findings during the audit, including the Springfield Urban League payment. But the evidence shows that parties involved were worried about it, as they tried to figure out why the payment was made, and this anxiety continued after May 2010, when Sullivan sent an e-mail to Sambolin expressing Sisk's concern that Blair was going to blame the improper payment on her department. Although evidence about the audit was limited due to DHS's pretrial motion *in limine*, it strains credulity to think that an audit finding of a $100,000 improper payment had no repercussions. Sullivan's e-mail, stating that Sisk didn't want her department to be blamed, indicates that the audit finding had repercussions. And, the evidence shows Blair, head of fiscal services, was none too pleased with Wynn identifying him as the source of the improper payment.

¶ 68 DHS argues that the trial court's finding that Sisk and Sullivan lacked retaliatory motive negates a finding that nonrenewal of Wynn's employment was motivated by animus. Sisk said she valued Wynn as an employee and encouraged him to apply for the position and Sullivan tried to keep him on by contacting a federal officer involved in the Healthy Start program. But to prevail, Wynn was not required to show animus on their part. Still Sisk and Sullivan's statements and actions support the judge's finding that Blair was angry. It is reasonable to conclude that Sisk knew Blair was angry and for that reason asked Wynn why he said anything to the auditor and told him to be "quiet as a church mouse" at the exit conference. This is supported by her testimony that she thought Blair was frustrated and "perturbed."

- 12 -

¶ 69    DHS asserts the termination of Wynn's employment, coming five months after his protected discussion with the auditor in November 2009, was too remote to support a finding of causation. Additionally, DHS asserts that the judge erred in finding the March 2010 audit exit conference was part of Wynn's protected activity and then using it to shorten the temporal link between his protected activity and termination.

¶ 70    Taking DHS's second contention first, nothing in the record supports a finding that the trial court found that the audit exit conference itself was protected activity. The trial court stated that proximity in time between the audit exit conference and Wynn's termination was indirect evidence of protected activity and the reporting of an improper payment during the ongoing audit served as a contributing factor in the termination decision. It would make sense that, in the context of an audit, any retaliatory action would not occur until completion of the audit. The audit ended in March 2010; the following month, April 2010, Wynn was informed about his impending termination.

¶ 71    Suspicious timing is one of many types of circumstantial evidence of wrongful termination. *Troupe*, 20 F.3d at 736. "A specified time period cannot be a mechanically applied criterion. A rule that any period over a certain time is per se too long (or, conversely, a rule that any period under a certain time is per se short enough) would be unrealistically simplistic." *Coszalter v. City of Salem*, 320 F.3d 968, 977-78 (9th Cir. 2003). DHS cites several cases in which a short time span between the protected activity and the retaliation was deemed *prima facie* evidence of retaliation. Be that as it may, DHS does not cite any authority to support its contention that five months is too long. Indeed, courts have held that "[d]epending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation." *Coszalter*, 320 F.3d at 977. Even an 11-month gap has been regarded as within the range to support an inference that an employment decision was retaliatory. *Id.* (citing *Allen v. Iranon*, 283 F.3d 1070, 1078 (9th Cir. 2002)). The audit took nearly a year to complete, so the retaliatory action, coming five months after the protected activity and only one month after the completion of the audit, follows sufficiently close enough to support an inference of retaliation.

¶ 72    Another DHS argument assumes Wynn would have been terminated even in the absence of his protected activity, in light of the State converting contract employees to permanent union employees. Because Wynn's job title had been classified as a union title in 2008, DHS maintains that Wynn could not have retained his job without violating the union's collective bargaining agreement.

¶ 73    Section 15-20 of the Ethics Act provides, "It is not a violation *** if it is demonstrated by clear and convincing evidence that the officer, member, other State employee, or State agency would have taken the same unfavorable personnel action in the absence of that conduct." 5 ILCS 430/15-20 (West 2014). Courts have defined clear and convincing evidence as the degree of proof that leaves no reasonable doubt in the mind of the fact finder as to the truth of the proposition in question. *Bazydlo v. Volant*, 164 Ill. 2d 207, 213 (1995). Clear and convincing evidence requires more proof than a preponderance while not quite approaching the most difficult level of proof necessary to convict a person of a criminal offense. *Id.*

¶ 74    The trial court stated that accepting Wynn would have lost his position anyway requires believing Blair was neutral in gathering and transmitting information and categorizing jobs. But the trial court found Blair's testimony not to be credible, noting that Blair could not recall

important events, including the audit exit conference. The trial court also found Blair's denial that he was upset with Wynn belied by the testimony of several witnesses.

¶ 75   Further, the evidence showed that at least two contract employees similarly situated to Wynn remained employed after December 31, 2010, having been transferred to a vendor agency.

¶ 76   We agree with the trial court determination regarding DHS's claim that Wynn's job classification mandated that his position be converted to a union position. This claim was discredited by the continuing practice of transferring contractors to vendors and the evidence that classification alone was not the sole factor in determining whether a position was deemed union work. In sum, DHS failed to present clear and convincing evidence to show not that Wynn *may* have lost his job regardless of his protected activity, but that he *would* have lost it.

¶ 77   Wynn did not need to prove Blair caused him to lose his job but only that he played a role. The trial court's finding that the evidence showed Blair had motive and opportunity to terminate Wynn's employment was not against the manifest weight of the evidence. We find no basis for reversing the trial court's findings of fact or its judgment.

¶ 78   Lastly, in its reply brief, DHS cites two statutes, the Illinois Human Rights Act (775 ILCS 5/1-101 *et seq.* (West 2014)) and the Illinois Whistleblower Act (740 ILCS 174/1 *et seq.* (West 2014)), to bolster its argument that the legislature made a deliberate decision to exclude an employee's discharge in the form of nonrenewal of a contract as retaliation under the Ethics Act. Wynn filed a motion for leave to file a surreply, which we have taken with the case, arguing that these DHS's assertions regarding those statutes were waived because they were not raised in the opening brief. We agree. Illinois Supreme Court Rule 341(h)(7) (eff. Jan. 1, 2016) provides that points not argued in appellant's opening brief "are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Because DHS failed to raise those statutes in its opening brief, that point has been forfeited, and we will not consider it further.

¶ 79   Affirmed.