NOTICE

Decision filed 03/04/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 190027-U

NO. 5-19-0027

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| JEFFREY BLOCK, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 11-L-47 |
| | ) | |
| OFFICE OF THE ILLINOIS SECRETARY | ) | |
| OF STATE and MICHAEL PIPPIN, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | Honorable |
| (Office of the Illinois Secretary of State, | ) | Eric J. Dirnbeck, |
| Defendant-Appellee). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE WELCH delivered the judgment of the court.
Justices Moore and Wharton concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The judgment of the circuit court of Jefferson County in favor of the defendant, the Office of the Illinois Secretary of State (Secretary of State), is affirmed where the court's finding that, although the plaintiff proved he engaged in statutorily protected whistleblowing conduct, he failed to prove that such conduct was a contributing factor in the Secretary of State's decision to terminate his employment was not against the manifest weight of the evidence.

¶ 2   On August 13, 2010, the plaintiff, Jeffrey Block, filed a complaint alleging, *inter alia*, a violation of the State Officials and Employees Ethics Act (Ethics Act) (5 ILCS 430/1-1 *et seq.* (West 2006)) against the defendant, the Office of the Illinois Secretary of State (Secretary of

1

State).[1] After the trial court granted the Secretary of State's motion to dismiss the plaintiff's Ethics Act claim on sovereign immunity grounds, this court reversed and remanded the case for further proceedings. See *Block v. Office of Illinois Secretary of State*, 2013 IL App (5th) 120157, ¶¶ 1, 17. On remand, a bench trial was held, which resulted in a verdict in favor of the Secretary of State. On appeal, the plaintiff argues that the judgment was against the manifest weight of the evidence. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     In pertinent part, the evidence adduced at trial revealed the following. During the time period relevant to this appeal, the Secretary of State was made up of several different departments, including the department of police, the department of personnel, and the office of the inspector general. The department of police employed sworn police officers called "investigators" who investigated crimes under the Illinois Vehicle Code (625 ILCS 5/1-100 *et seq.* (West 2018)). The department of police also conducted internal investigations into allegations of misconduct by its employees.

¶ 5     The plaintiff was employed as an investigator in District 4 of the department of police, which was headquartered in Mount Vernon, Illinois. At the time of the events giving rise to his discharge, his immediate superior was Sergeant Michael Hoffman, who reported to Captain Brad Warren. Warren reported to Brad Demuzio, the director of the department of police, as well as Steve Rutledge and Larry Schmidt, the deputy directors of the department of police.

---

[1]Additionally, the plaintiff's complaint alleged violations of the Uniform Peace Officers' Disciplinary Act (Disciplinary Act) (50 ILCS 725/1 *et seq.* (West 2006)) against the Secretary of State and its employee, Michael Pippin, respectively. The trial court also granted the motion to dismiss with respect to these two counts and that decision was not appealed. Thus, the only allegations relevant to this appeal are those relating to the Secretary of State's alleged violation of the Ethics Act.

¶ 6     The department of personnel made employment decisions for all departments within the Secretary of State's office, including disciplinary decisions. Other departments, including the department of police, employed liaisons to interact with the department of personnel on employment issues. At the time of the plaintiff's discharge, Stephan Roth was the director of the department of personnel and Gina DiCaro was its discipline coordinator.

¶ 7     The office of the inspector general investigated alleged violations of the Ethics Act and other alleged acts of wrongdoing within the Secretary of State. In cases of alleged misconduct by department of police investigators, the office of the inspector general sometimes assisted the department of police in their investigations. In other cases, the office of the inspector general would investigate department of police investigators without involving the department of police. Nathan Maddox was the executive inspector general for the Secretary of State during the time period relevant to this appeal.

¶ 8         A. The Plaintiff's Performance Prior to His Whistleblowing Activity

¶ 9     The plaintiff began working as a department of police investigator in 1988. At trial, Captain Warren testified that, in the first few years of the plaintiff's employment, he was "a very good police officer, hard working, [and] conscientious." According to Warren, however, the plaintiff's performance began steadily declining in the late 1990s, and this continued through the remainder of his employment. The plaintiff testified that between 2005 and 2007 his performance was affected by marital problems and Crohn's disease, which he was diagnosed with in June 2004. In early 2006, the plaintiff requested medical leave for his Crohn's disease, which was granted.

¶ 10    According to Sergeant Hoffman, the plaintiff's performance started "suffering long before" his Crohn's disease diagnosis. Hoffman testified that he tried to help the plaintiff with his marital and medical problems for "years and years and years." Hoffman repeatedly encouraged the

3

plaintiff to use the psychological services available through the department of police's Employee Assistance Program, but the plaintiff refused. Hoffman also helped the plaintiff with his request for medical leave.

¶ 11    After the plaintiff returned from medical leave in March 2006, Director Demuzio instructed Warren to require the plaintiff to attend weekly mental health counseling and to meet with Hoffman regularly. During these biweekly meetings, Hoffman and the plaintiff discussed the personal and professional issues the plaintiff was dealing with and strategies for improving his work performance.

¶ 12                    B. The Plaintiff's Whistleblowing Activity

¶ 13    In April 2006, Lieutenant Robert Wingo of the department of police, who was one of the plaintiff's superior officers, and his personal friend, asked the plaintiff to come to his house while he was off duty. During the plaintiff's visit, Wingo confessed that he was having an affair with a coworker. Wingo was afraid that the coworker was going to accuse him of sexual harassment, so he asked the plaintiff and another friend to help him think of a false story to discredit any allegations against him. The plaintiff did not act on Wingo's request.

¶ 14    In August 2006, the office of the inspector general began investigating Wingo for misusing grant funds. The investigation revealed that Wingo reported being on duty to receive compensation funded by state and federal government grants but did not actually perform any work during that time.

¶ 15    On September 4, 2006, Wingo called the plaintiff and asked him to watch his children while he ran a triathlon in Missouri. Wingo then told the plaintiff that he was going to falsely report being on duty to receive grant-funded compensation while he was participating in the

4

triathlon. After this conversation, the plaintiff decided to report Wingo's misconduct to his superiors.

¶ 16    On September 12, 2006, the plaintiff and his attorney met with Director Demuzio, Executive Inspector General Maddox, and Director Roth. The plaintiff asked if he would be given whistleblower protection for disclosing information about Wingo; Maddox said that he would. The plaintiff then recounted Wingo's alleged misconduct. Both Roth and Maddox testified that they did not believe the plaintiff revealed anything new about Wingo because the investigation about Wingo's misuse of grant funds was already ongoing. However, they could not recall if they had heard about Wingo's attempt to cover up sexual harassment before they met with the plaintiff.

¶ 17    On September 27, 2006, Wingo committed suicide.

¶ 18                C. The Plaintiff's Work Performance After Wingo's Death

¶ 19    The night after Wingo's death, the plaintiff failed to inform dispatch that he was going off duty and did not answer his cell phone. The next day, Warren, still unable to reach the plaintiff, requested that the Illinois State Police broadcast an "attempt to locate" message to all police agencies in the state. The message stated that the plaintiff was missing, possibly armed, and possibly suicidal. After the message was sent out, a department of police investigator found the plaintiff at the home of his estranged wife, Sandy.[2]

¶ 20    The plaintiff testified that, throughout October 2006, he was experiencing grief over Wingo's death and still dealing with marital issues. Warren testified that Wingo's death affected the morale of every officer in the department of police, not just the plaintiff. Warren did not believe that the plaintiff was struggling to deal with it any more than any other investigator.

---

[2]Because the plaintiff and his estranged wife share a last name, we will refer to Sandy by her first name for ease of reference.

¶ 21    Hoffman continued to meet with the plaintiff every two weeks throughout the summer and fall of 2006, and he reported on the plaintiff's work performance to his superiors. On October 3, 2006, Hoffman told Warren that the plaintiff had "not completed any work for the month of September." Hoffman stated that the plaintiff lacked the "self discipline or drive to complete [any] case report writing" and that individuals had complained about his failure to return phone calls. Ten days later, Hoffman again reported that the plaintiff's "lack of work ethic" was causing problems. Hoffman noted that the plaintiff had not turned in any completed work in August, September, or October of that year and that the plaintiff had not reported any work activity in 33 of his 43 assigned cases. Nevertheless, Hoffman stated that, in light of Wingo's death, he did not believe that disciplining the plaintiff was appropriate at that time. Correspondence between Hoffman, Warren, and other supervisors reveals that they were actively trying to help the plaintiff improve his work performance, but he was not responsive to their assistance. On October 24, 2006, Warren wrote that he and the plaintiff's supervisors had "exhausted every possible motivation/disciplinary tool [they] could collectively think of."

¶ 22    On November 1, 2006, Hoffman told Warren that the plaintiff had not updated any of his reports in October and had "completely shut down on his duties and requirements." Hoffman noted that the Perry County State's Attorney's office was upset at the plaintiff's failure to complete his investigation in one case so that it could begin its prosecution. Hoffman believed that the plaintiff had recovered from Wingo's death; he noted that the plaintiff had not mentioned Wingo in two weeks and did not seem depressed.

¶ 23            D. The Investigation Into the Plaintiff's Alleged Misconduct

¶ 24    On October 25, 2006, Warren was contacted by Sandy, who said she wanted to meet with him to discuss the plaintiff's allegedly "unethical and possibly illegal" conduct. Sandy claimed

6

that the plaintiff broke into her house, accessed her phone records, and hacked into her computer. She also claimed that the plaintiff slept all day while telling the department of police that he was on duty. Warren relayed this information to Deputy Director Schmidt and Steve Chiapelli, an investigator for the office of the inspector general. Warren recognized "the potential for inaccurate information coming from an *** estranged spouse" but requested that an investigation be initiated into Sandy's allegations.

¶ 25    Captain Michael Pippin, who was in charge of all internal investigations for the department of police, was assigned to investigate Sandy's allegations. Pippin was outside of the plaintiff's chain of command.

¶ 26    On October 26, 2006, Pippin interviewed Sandy. Pippin testified that he "was concerned" by Sandy's allegations, but he did not immediately determine whether they were "credible or not." He added that his investigation was designed, at least in part, to find out if Sandy was telling the truth. Pippin and Office of the Inspector General Inspector Tim Young conducted a follow-up interview with Sandy on November 27, 2006.

¶ 27    At Demuzio's direction, Pippin installed a global positioning system (GPS) tracking device on the plaintiff's squad car to assess the veracity of Sandy's claim that the plaintiff was engaging in personal activities while reporting that he was on duty. The GPS tracker recorded the plaintiff's whereabouts from October 26, 2006, to November 2, 2006. Thereafter, Pippin compared the data from the tracker to the plaintiff's activity reports in the department of police's computer-aided dispatch (CAD) system. The CAD system was a radio broadcast system used by the department of police to keep track of its investigators' work activity. Throughout the day, department of police investigators were required to report their activities, whereabouts, and the case they were working on to CAD.

7

¶ 28    Pippin drafted documents detailing the discrepancies between the plaintiff's CAD reports and the GPS data.  These documents showed that the plaintiff repeatedly notified CAD that he would be in one location, when the GPS tracker showed his squad car in a different location.  For example, on October 27, 2006, the plaintiff reported to CAD that he was writing reports at the department of police's Carbondale, Illinois, office, but the GPS showed him parked at his residence in a different part of Carbondale.  Similarly, on October 30, 2006, the plaintiff reported that he was on duty performing an investigation, but the GPS showed that he drove to Sandy's house in O'Fallon, Illinois.  Pippin also noted that the GPS showed that, on three of the days recorded, the plaintiff's squad car reached a maximum speed of 100, 87.6, and 98.2 miles per hour, respectively, though CAD did not reflect any traffic stops or activity requiring the plaintiff to travel at excessive speeds.

¶ 29    On November 14, 2006, Hoffman, at Pippin's request, questioned the plaintiff about his work activity on October 27 and 30, 2006.  According to Hoffman, the plaintiff said he could not remember his location or activity on either day.  Hoffman asked the plaintiff why he was not using CAD, and the plaintiff responded by asking if every investigator was using CAD or if Hoffman was singling him out.  The plaintiff admitted that he had been trained on how to use CAD and said that "he would do better."  Hoffman subsequently drafted a summary of his November 14 meeting with the plaintiff and gave it to Pippin.

¶ 30    Pippin and Toni Bentel, the department of police's liaison to the department of personnel, prepared a "Notification of Charges/Allegations," which Hoffman served on the plaintiff on November 15, 2006.  The Notification of Charges/Allegations listed numerous Secretary of State and department of police policies that the plaintiff had violated, including misusing state working time, falsifying reports, violating the Illinois Vehicle Code, and engaging in conduct that brought

8

discredit on the department of police. The notice also informed the plaintiff that he had been scheduled for an interrogation with Department of Police Lieutenant Donelle Grygiel and Inspector Young.

¶ 31 On November 21, 2006, the plaintiff, accompanied by an attorney, appeared for his formal interrogation. Although Pippin was present, only Grygiel and Young questioned the plaintiff. Pippin testified that he asked Grygiel to conduct the interrogation because she was not assigned to District 4; Pippin used investigators from different districts to conduct internal interrogations to avoid "any kind of prejudice."

¶ 32 At the outset of the interrogation, the plaintiff said he was unorganized and distracted since Wingo's death. He admitted that he had done a poor job in his investigations, was not a "perfect report writer," failed to return phone calls, and had not "done *** a great job with CAD." When Grygiel asked him if he ever reported to CAD that he was conducting an investigation when he was actually at his residence, the plaintiff admitted that he had in the past "stayed at [his] house for whatever reason." He claimed that this was "not a normal thing" but acknowledged that it had "happened *** for whatever reason—being on the telephone or whatever." He could not say how often he stayed at home while reporting that he was on duty. When asked why he did not tell his supervisors that he was staying home, the plaintiff cited the mental health issues he had been dealing with since Wingo's death. The plaintiff provided Grygiel and Young with a note from his counselor diagnosing him with panic disorder, major depressive disorder, and posttraumatic stress disorder (PTSD).

¶ 33 Grygiel then confronted the plaintiff with the discrepancies between his CAD reports and the GPS data. Specifically, Grygiel noted that, on October 27, 2006, GPS showed the plaintiff leaving his house at 8:35 a.m., but he did not report being on duty until 9:07 a.m. The plaintiff

9

could not explain this discrepancy except by saying that his "head [was] in the clouds." Grygiel then asked the plaintiff why, on the same day, he reported to CAD that he was writing reports at the department of police's Carbondale office from 10:20 a.m. to 1:19 p.m., but the GPS showed that he was driving around a different part of Carbondale and at his residence during that time. The plaintiff responded that his CAD report was "obviously not accurate," but he had "no idea why."

¶ 34   Grygiel also asked why, on October 30, 2006, the plaintiff reported to CAD that he was on duty at 7:52 a.m., but the GPS showed that, instead of doing any work, he drove 89 minutes to Sandy's house in O'Fallon. The plaintiff claimed that Sandy was not answering her phone, so he drove to her house to "make sure she was okay." The plaintiff admitted that he did not tell any of his supervisors that he was traveling to O'Fallon. He also did not dispute the GPS data showing that he drove 100 miles per hour on that trip. The plaintiff agreed that after he left Sandy's house, he drove to the District 4 headquarters in Mount Vernon, then went to an address on North 27th Street without reporting the trip to CAD. After stopping on North 27th Street, the GPS showed that the plaintiff drove to a friend's house on Gray Drive in Carbondale. Although he used the code for investigation during that time, the plaintiff admitted that he did not perform any official business while he was there. When asked why he told CAD that he was participating in an investigation when he was actually visiting a friend, the plaintiff answered that he had "no idea."

¶ 35   The plaintiff also could not remember why he returned to that same friend's house the next day, October 31, 2006, while reporting to CAD that he was on duty. Grygiel noted that, other than the visit to his friend's house, the GPS data showed the plaintiff driving aimlessly around Carbondale. The plaintiff admitted that he had "done a lot of that" and again said that his "head [had] been in the clouds." Grygiel then asked the plaintiff what he was doing on November 2,

10

2006, when his CAD report said that he was on duty at the Carbondale office but the GPS tracker showed his squad car sitting motionless in different areas of Carbondale and driving to Livan, Illinois. The plaintiff again said that he had "no idea" and he could have been doing "a variety of things."

¶ 36    At the conclusion of the interrogation, the plaintiff admitted that his CAD reports were inaccurate but said that he would "make attempts to correct it." The plaintiff said he was not proud of his lack of productivity, but he hoped that the department of police would "help [him] out" because was "struggling" over Wingo's death. Other than the day he drove 100 miles per hour to O'Fallon because he was worried about Sandy, the plaintiff could not explain why he drove at excessive speeds at times when he was not making a traffic stop.

¶ 37    Pippin subsequently completed an investigative report summarizing the evidence he gathered during his investigation. Pippin then sent his report, his comparisons of the GPS data to the plaintiff's CAD reports, and the transcript of the interrogation to Director Demuzio; the information was eventually forwarded to the department of personnel.

¶ 38                    E. The Decision to Discharge the Plaintiff

¶ 39    As the director of the department of personnel, it was Roth's responsibility to determine what discipline was appropriate to impose on the plaintiff. Before making its decision, the department of personnel sent the plaintiff for an independent medical examination in light of his complaints of anxiety, depression, and PTSD. Dr. Terry Killian, a psychiatrist, performed the examination in February 2007. DiCaro, the department of personnel's discipline coordinator, provided Dr. Killian with a list of issues to evaluate, the plaintiff's personnel records, and information from Pippin's investigation. DiCaro denied that the independent medical examination

11

was performed as cover for any retaliation against the plaintiff for engaging in whistleblowing activity.

¶ 40    In April 2007, Dr. Killian concluded that the plaintiff was fit for duty.  DiCaro and Roth both testified that Dr. Killian's finding was not the reason that the plaintiff was ultimately discharged—it only affected the disciplinary decision to the extent that it showed that his mental condition did not impair his ability to do his job.

¶ 41    After the plaintiff was found fit for duty, Roth reviewed the evidence from Pippin's investigation, determined that the plaintiff's conduct warranted discharge, and directed DiCaro to prepare a letter informing the plaintiff of the decision.  The letter, which DiCaro drafted with input from Roth and Pippin, stated that the plaintiff was "being considered for discharge" from his position with the Secretary of State.  It listed nine charges against the plaintiff:  (1) insubordination or disobedience; (2) incompetence or inefficiency in the performance of a duty, or inattention to duty; (3) making false reports; (4) misuse or abuse of state working time for reasons other than the plaintiff's assigned duties; (5) misusing state property for reasons other than the plaintiff's assigned duties; (6) disorderly conduct during work hours; (7) failing to perform duties during scheduled work hours; (8) failure to obey all laws, ordinances, rules, and regulations; and (9) failing to treat state property with due care.  The letter cited the discrepancies between the plaintiff's CAD reports and the GPS data, as well as the plaintiff's speeding in his squad car.  It further noted that, during his interrogation, the plaintiff "made several admissions to violations of policy," which supported the charges against him, including his admission that he failed to use the CAD system properly and failed to update his case reports.

¶ 42    The letter stated that, on September 24, 2000, the plaintiff served an eight-day suspension "as a result of [his] filing of false reports and misrepresentation of [his] work activities."  Roth

acknowledged that he generally did not consider an employee's past discipline that was more than 12 months old in assessing progressive discipline. Roth explained, however, that the letter mentioned the plaintiff's prior suspension, not as a basis for more severe discipline, but rather to show that the plaintiff should have known that the rules prohibited him from filing false reports and misrepresenting his work activity.

¶ 43 The letter concluded that the plaintiff "repeatedly misrepresented [his] whereabouts," "attempted to conceal [his] inactivity *** by giving false reports through *** CAD," ignored his assigned responsibilities, and "traveled at speeds in excess of the posted speed limits" without justification. It also asserted that the plaintiff acknowledged that he was familiar with the rules and procedures of the department of police but "willfully and consciously chose not to adhere to them." The letter directed the plaintiff to submit his rebuttal to the charges within four days.

¶ 44 In his rebuttal, the plaintiff "acknowledge[d] and accept[ed] responsibility for the policies [he] violated" but claimed that discharge was "unjustified and excessive." The plaintiff stated that he had received "numerous commendations" in the past and "strived to be a good employee." He also noted that he had experienced stress and anxiety after he reported Wingo's misconduct and that his emotional state was "fragile" following Wingo's death. The plaintiff further alleged that the department of police had tried to cause him more stress and failed to take any responsibility for the situation. The plaintiff claimed that the message the department of police broadcasted when it could not locate him on September 29, 2006, "outraged and humiliated" him because it said he was suicidal. He also alleged that the department of police failed to make a "reasonable accommodation" for his mental health issues, which he asserted fell under the Americans with Disabilities Act. The plaintiff argued that, in light of his mental state, progressive discipline was warranted before his termination.

13

¶ 45   Roth reviewed the plaintiff's rebuttal prior to making his final decision. Roth testified that he reviewed an employee's rebuttal before imposing discipline and, if it raised factual questions, he would order further investigation. He determined that, in the plaintiff's case, the rebuttal did not raise any such questions. Roth noted that the plaintiff admitted that he had committed policy violations, and thus, there was no need for further investigation. He disagreed with the plaintiff's request for progressive discipline because the information gathered and "the severity of the situation" warranted discharge. Roth explained that the plaintiff's misconduct was severe and justified discharge because it "involved theft of time; basically, that he was supposed to be doing work [but was not] doing work." The plaintiff also filed false reports, which called into question his truthfulness. Roth believed that truthfulness was especially important for law enforcement officers like the plaintiff because "[i]f [they are] called before a case and they have to give testimony, the last thing you want is somebody who has been disciplined for not providing truthful information." Roth noted that other Secretary of State employees who were found guilty of theft of time had also been discharged. Finally, Roth indicated that the plaintiff's invoking of his rights as a whistleblower during the September 12, 2006, meeting was not a factor in the decision to discipline him. Roth did not see any evidence that Pippin or Hoffman held any bias against the plaintiff or had any motive to try to get him fired. This was corroborated by Pippin, who testified that his investigative decisions were not influenced by the fact that the plaintiff had reported wrongdoing by Wingo.

¶ 46   The plaintiff was discharged from his employment on July 16, 2007.

¶ 47                              F. Relevant Procedural Posture

¶ 48   In August 2010, the plaintiff initiated the present action in the circuit court. In his complaint, he alleged that the Secretary of State retaliated against him in violation of the Ethics

14

Act. The court dismissed the plaintiff's Ethics Act claim on the basis of sovereign immunity, but the dismissal was reversed on appeal. *Block*, 2013 IL App (5th) 120157, ¶¶ 1, 17. Finding that the Ethics Act claim was not barred by sovereign immunity, this court remanded the case for further proceedings on that claim. *Id*. ¶¶ 7-17.

¶ 49 On remand, the case proceeded to a bench trial on March 6 and 7, 2008. The plaintiff, DiCaro, Hoffman, Maddox, and Roth testified at trial, and the parties submitted depositions of Warren and Pippin in lieu of live testimony. The trial court admitted all of the parties' exhibits without objection except for the Secretary of State's exhibits 1, 11, 15, and 17.

¶ 50 After considering the evidence and the parties' written closing arguments, the trial court found that the plaintiff proved that he had engaged in statutorily protected whistleblowing conduct under the Ethics Act but failed to prove that such conduct was a contributing factor in the Secretary of State's decision to terminate his employment. Thus, the court entered a judgment in favor of the Secretary of State and against the plaintiff.

¶ 51 The plaintiff timely filed his notice of appeal on January 9, 2019.

¶ 52                                    II. ANALYSIS

¶ 53 In reviewing a trial court's judgment following a bench trial, we will affirm so long as the judgment is not against the manifest weight of the evidence. *Wynn v. Illinois Department of Human Services*, 2017 IL App (1st) 160344, ¶ 56; *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 859 (2008). " 'A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence.' " *Buckner v. Causey*, 311 Ill. App. 3d 139, 143 (1999) (quoting *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995)).

15

¶ 54    "As the trier of fact, the trial judge was in a superior position to judge the credibility of the witnesses and determine the weight to be given to their testimony. [Citation.] When contradictory testimony that could support conflicting conclusions is given at a bench trial, an appellate court will not disturb the trial court's factual findings based on that testimony unless a contrary finding is clearly apparent." *Chicago's Pizza*, 384 Ill. App. 3d at 859.

¶ 55    Under section 15-10(1) of the Ethics Act, a state employee or state agency is prohibited from taking any retaliatory action against a state employee who "[d]iscloses or threatens to disclose to a supervisor or to a public body an activity, policy, or practice of any officer, member, State agency, or other State employee that the State employee reasonably believes is in violation of a law, rule, or regulation." 5 ILCS 430/15-10(1) (West 2006). "A violation of this Article may be established only upon a finding that (i) the State employee engaged in conduct described in Section 15-10 and (ii) that conduct was a contributing factor in the retaliatory action alleged by the State employee." *Id*. § 15-20. A "contributing factor" has been defined as any factor, in isolation or combined with other factors, that tends to affect the outcome of the decision. *Wynn*, 2017 IL App (1st) 160344, ¶ 58.

¶ 56    In this case, it is undisputed that the plaintiff engaged in statutorily protected whistleblowing conduct when he reported on Wingo. The plaintiff contends on appeal, however, that the trial court's finding that such conduct was not a contributing factor in the Secretary of State's decision to discharge him was against the manifest weight of the evidence. In support of his position, the plaintiff argues that the following evidence showed that his whistleblowing was a contributing factor in his discharge: (1) his issues of poor work performance had not resulted in disciplinary action prior to his reporting of Wingo, (2) Pippin's investigation arose from allegations made by the plaintiff's estranged wife, (3) Pippin researched laws relating to

16

whistleblower protections on the same day that the plaintiff reported on Wingo, (4) the plaintiff was not informed of his rights under the Disciplinary Act during his formal interrogation, (5) "questionable medical determinations," (6) the Secretary of State failed to impose progressive discipline, and (7) another department of police investigator who reported Wingo's misconduct was also terminated.

¶ 57    In pursuing such an argument on appeal, the plaintiff asks us to ignore our standard of review by ruling on matters of witness credibility and the weight given to conflicting evidence. However, a reviewing court "may not assess the credibility of witnesses, and we will reverse the [trial] court's factual determinations only if they are clearly against the manifest weight of the evidence." *ALSJ, Inc. v. Kurtz*, 2016 IL App (2d) 150492, ¶ 49.  Based on our review of the record, we find that the court's conclusion was not against the manifest weight of the evidence because the Secretary of State presented overwhelming evidence that the plaintiff's discharge was related to an extended period of declining work performance and policy violations to which he admitted.

¶ 58    The department of personnel letter informing the plaintiff that he was "being considered for discharge" listed nine charges to support the decision: (1) insubordination or disobedience; (2) incompetence or inefficiency in the performance of a duty, or inattention to duty; (3) making false reports; (4) misuse or abuse of state working time for reasons other than the plaintiff's assigned duties; (5) misusing state property for reasons other than the plaintiff's assigned duties; (6) disorderly conduct during work hours; (7) failing to perform duties during scheduled work hours; (8) failure to obey all laws, ordinances, rules, and regulations; and (9) failing to treat state property with due care.  The letter cited to the discrepancies between the plaintiff's CAD reports and the GPS data, as well as the plaintiff's speeding in his squad car.  It further noted that, during his interrogation, the plaintiff "made several admissions to violations of policy" that supported the

17

charges against him, including his admission that he failed to use the CAD system properly and failed to update his case reports.

¶ 59    The letter went on to explain that, in September 2000, the plaintiff served an eight-day suspension "as a result of [his] filing of false reports and misrepresentation of [his] work activities." Although this fact was not used as a basis for more severe discipline, it indicated that the plaintiff should have known that the rules prohibited him from filing false reports and misrepresenting his work activity. The letter then concluded that the plaintiff "repeatedly misrepresented [his] whereabouts," "attempted to conceal [his] inactivity *** by giving false reports through *** CAD," ignored his assigned responsibilities, and "traveled at speeds in excess of the posted speed limits" without justification. Finally, the letter asserted that the plaintiff acknowledged that he was familiar with the rules and procedures of the department of police but "willfully and consciously chose not to adhere to them."

¶ 60    The letter did not rely on the fact that the plaintiff had reported on Wingo as a reason for his proposed discharge. Similarly, Roth's testimony indicated that the plaintiff's whistleblowing activity was not a factor that he considered when he decided to discipline him. Roth further testified that he did not see any evidence that Pippin or Hoffman held any bias against the plaintiff or had any motive to try to get him fired. Pippin himself testified that his investigative decisions were not influenced by the fact that the plaintiff had reported wrongdoing by Wingo.

¶ 61    In contrast to the plaintiff's assertion, testimony presented by Roth demonstrated that he believed discharge was warranted instead of progressive discipline because of the information that had been gathered against the plaintiff and because of the "severity of the situation." Roth explained that the plaintiff's misconduct was severe and justified discharge because it "involved theft of time; basically, that he was supposed to be doing work [but was not] doing work." The

18

plaintiff also filed false reports, which called into question his truthfulness. Roth considered this especially troublesome because if the plaintiff were to be called to testify in a case "and [he would] have to give testimony, the last thing you want is somebody who has been disciplined for not providing truthful information." Roth further testified that other Secretary of State employees who were found guilty of theft of time (one of the plaintiff's charges) had also been discharged.

¶ 62    In addition to the preceding, the testimony of the plaintiff's supervisors revealed years of poor work performance by the plaintiff. According to Warren, the plaintiff's performance began steadily declining in the late 1990s, and this continued through the remainder of his employment. Hoffman similarly testified that the plaintiff's performance started "suffering long before" his marital issues, Crohn's disease diagnosis, whistleblowing activity, or even Wingo's death. And although Hoffman tried to help the plaintiff with his marital and medical problems, the plaintiff refused.

¶ 63    Moreover, the evidence indicated that, beginning in March 2006, the plaintiff was required to attend weekly mental health counseling and meet with Hoffman regularly to discuss his personal and professional issues as well as strategies to improve his work performance. After the events surrounding Wingo's death occurred, the plaintiff's work performance increasingly suffered. The plaintiff failed to complete any work in August, September, or October of 2006, but Hoffman advised against disciplining the plaintiff at that time considering Wingo's death. Correspondence between Hoffman, Warren, and other supervisors revealed they were actively trying to help the plaintiff improve his work performance, but he was not responsive to their assistance.

¶ 64    After Pippin investigated the truth of Sandy's allegations, discrepancies were revealed between the plaintiff's CAD reports and his actual whereabouts throughout the workday. Thereafter, the plaintiff was informed that he had violated numerous Secretary of State and

19

department of police policies, including misusing state working time, falsifying reports, violating the Illinois Vehicle Code, and engaging in conduct that brought discredit on the department of police. The plaintiff was then formally interrogated about the charges against him. Importantly, the plaintiff made several admissions during this interrogation, including that (1) he had done a poor job in his investigations, (2) he was not a "perfect report writer," (3) he failed to return phone calls, (4) he had not "done *** a great job with CAD," (5) he had "stayed at [his] house for whatever reason" while reporting to CAD that he was conducting an investigation, (6) he took a personal trip to O'Fallon during work hours without informing any of his supervisors, and (7) his CAD reports were inaccurate. The plaintiff could not explain the discrepancies in his CAD reports versus his actual whereabouts as revealed by the GPS data. Finally, the plaintiff did not dispute that he drove at excessive speeds at times when he was not making a traffic stop but could not explain why that happened.

¶ 65    Given the record before us, the evidence clearly supported the trial court's conclusion that the plaintiff's whistleblowing activity was not a contributing factor in the Secretary of State's decision to discharge him. The testimony of Warren, Hoffman, Pippin, and Roth, along with the plaintiff's own admissions, demonstrate that the Secretary of State was justified in terminating the plaintiff because he admitted to policy violations and his work performance was inadequate, despite his supervisors' continued patience and attempts to help him improve. "It is well established that where, as here, the testimony adduced at trial conflicted and was contradictory, the trial judge, as trier of fact, was in a superior position to hear and weigh the evidence and determine the credibility of the witnesses." *Dutton v. Roo-Mac, Inc.*, 100 Ill. App. 3d 116, 122 (1981). Implicit in its ruling, the trial judge found the Secretary of State's version of the facts credible, and we find no reason to disturb that determination. Having carefully reviewed the record

20

in this case, we conclude that the court's judgment was not against the manifest weight of the evidence, as the opposite result was not clearly apparent, the decision was not unreasonable or arbitrary, and it was based on the evidence presented. Accordingly, we affirm the court's judgment in favor of the Secretary of State and against the plaintiff.

¶ 66                                    III. CONCLUSION

¶ 67    For the foregoing reasons, we affirm the judgment of the circuit court of Jefferson County.


¶ 68    Affirmed.